Wayne **SHERRARD** and Janet Sherrard, his wife, Plaintiffs,

v.

Donald S. **OWENS**, Judge of Probate Court, Ingham County, Lansing, Michigan; Michigan Department of Social Services, Family and Child Services of the Capitol Area, Inc.; Lucille Barber, Individually and as Employee Acting Director and Board Member of Family and Child Services of the Capitol Area, Inc.; Mary Ellen Heater, Individually and as Employee of Family and Child Services of the Capitol Area, Inc.; Barbara McLean, Individually and as Employee of Family and Child Services of the Capitol Area, Inc.; Timothy G. Holland, Attorney at Law, Individually and as guardian for Candace and Vernita Smith, Minors, Jointly and Severally, Defendants.

No. G79–482 CA5.

United States District Court,
W. D. Michigan, S. D.

Jan. 14, 1980.

Gerald M. Stevens, Owosso, Mich., for plaintiffs.

Timothy G. Holland, John F. Fuzak, Frank J. Kelley, Atty. Gen., Lansing, Mich., for defendants.

## OPINION AND ORDER

DOUGLAS W. HILLMAN, District Judge.

### I.

Plaintiffs, Wayne Sherrard and Janet Sherrard ("Sherrards"), moved for declaratory relief and a preliminary injunction enjoining defendants from taking any further action with respect to two foster minor children, Candace and Vernita Smith. Plaintiffs further seek a writ of Habeas Corpus to produce the children and return them to plaintiffs. The complaint prays for damages in the amount of $615,000. The complaint, which was filed on August 16, 1979, names the following defendants: (1) Donald S. Owens, Judge of Probate Court, Ingham County, Lansing, Michigan; (2) Michigan Department of Social Services (hereinafter "DSS"); (3) Family and Child Services of the Capitol Area, Inc. (hereinafter "FCS"); (4) Lucille Barber, Director of FCS; (5) Mary Ellen Heater and Barbara McLean, case workers of FCS; and (6) Timothy G. Holland, Attorney at Law and Guardian of the minors, Candace Smith and Vernita Smith.

Defendants have moved to dismiss and plaintiffs have countered with a motion to add additional parties defendants. The hearing on all pending motions was held on November 9, 1979. Prior thereto (August 23, 1979), then Chief Judge Noel P. Fox of this court issued a temporary restraining order, restraining all of the defendants from further "changing the physical custody or legal disposition of the children, Candace and Vernita Smith, until such time as there has been a full adversary hearing on the merits and the question of removal of the children from the foster home of the plaintiffs, or until further order of this court." The two foster children had been removed from plaintiffs' home and placed in another foster home on May 15, 1979.

On November 5, 1979, this case was assigned to me by Judge Fox, and a hearing in open court on all pending motions was held November 9, 1979.

Jurisdiction is claimed under Title 42, U.S.C. 1983, 1985, 1988; also Title 28, U.S.C. 1331, 1343, 2201, 2241, 2251 and further, that removal of the two foster children from plaintiffs' home violated the Due Process and Equal Protection Clause of the Fourteenth Amendment.

The saga of these two unfortunate children began in the Probate Court for the

County of Ingham, State of Michigan on May 12, 1977, when Elaine R. Thomas, a Children's Protective Services Social Worker, employed by Michigan Department of Social Services, presented petitions to a probate court referee alleging that the Probate Court had jurisdiction over Candace Smith, born October 31, 1973, and Vernita Smith, born February 28, 1976, under the terms of M.C.L.A. § 712A.2(b)(1), which provides among other things that the Probate Court shall have jurisdiction over any child found within the county:

"whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary support, education as required by law, medical, surgical or other care necessary for his health, morals, or who is deprived of emotional well-being, or who is abandoned by his parents, guardian or other custodian, or who is otherwise without proper custody or guardianship."

In support of her petition, Elaine Thomas alleged, in two separate identical petitions in the name of each child, that the children had been left with the paternal grandmother because the mother, Vicki Smith, "had purchased a car with her ADC grant" and, therefore, "did not have food for the children." It was further alleged in the petition that while the children's father had been living in the home of his parents, he had at some time earlier left the home, thereby leaving the children without proper custody as both of their parents had abandoned them.

The referee, finding that sufficient grounds existed to justify formal court inquiry, authorized Miss Thomas to file the petition and then set the matter for pre-trial conference before the Judge of Probate for June 13, 1977.

The referee's initial order provided in pertinent part as follows:

"IT IS ORDERED, that filing of said petition is authorized, that Monday, June 13, 1977, at 8:30 a. m. at the courtroom, 608 S. Washington Avenue, Lansing, Michigan; is assigned for hearing there-

on, and that Dorinda VanKempen, Family and Child Services, is appointed to investigate and make recommendations to the Court.

IT IS FURTHER ORDERED, that said minor be placed in the care and custody of the Director of Children's Services for placement in the Juvenile Home, her own home, a relative's home, a licensed boarding home, or any other such placement deemed necessary for the health and welfare of said child pending final disposition of said case, or until further order of the court with authority also to provide medical and psychological care.

\* \* \* \* \* \*

IT IS FURTHER RECOMMENDED, that the parents of said minor, Garold and Vickie Smith, are to keep Family and Child Services and Ingham County Probate Court informed of any change in their addresses or living situation.

IT IS FURTHER RECOMMENDED, that visitation with said minor by her parents shall be arranged by Family and Child Services."

The "Director of Children's Services" is the office referred to in the statute, M.C.L.A. § 712A.8 as the "county agent" or "juvenile probation officer". He is the administrator responsible for the court's staff of social workers who administer cases within the court's jurisdiction. The Director of Children's Services is appointed by and is directly responsible to the Probate Judge. He receives his funding from the county board of commissioners.

Notwithstanding the fact that the court operates its own staff of social workers under the direction of the Director of Children's Services, the court has contracted with a number of independent local agencies for administrative services in connection with the care of neglected and abused children. Cases are referred to the independent agencies on a random basis, depending on Court docket numbers assigned when cases are opened. Family and Child Services, referred to in the referee's initial order, quoted above, is one of the indepen-

dent contracting agencies. Also, Dorinda Van Kempen, referred to in the first paragraph of this order, was a social worker employed by Family and Child Services. It appears, however, that the case was not assigned to her as contemplated, but, rather, the agency assigned the Smith case to Ellen McKay, another social worker employed by that agency.

The referee ordered that counsel be appointed both for the natural mother and for the natural father and, in addition, ordered that a guardian ad litem be appointed to represent the interests of the children. Timothy G. Holland, attorney at law, resides in Lansing, Michigan, and was appointed guardian ad litem by the Probate Court on May 23, 1977.

A hearing on the petition was held before the Probate Judge on June 13, 1977. At that hearing, the natural mother was not present but the natural father appeared and announced that he desired to contest the petition. The court set the matter for trial on July 15, 1977. On that date, the mother of the children was not present in court and the contested hearing was adjourned until October 13, 1977. However, before adjournment on July 15, the court took testimony concerning the guardian ad litem's continued objection to the children remaining at the residence of the paternal grandparents. After taking of testimony, from two social workers, the court removed the children from the home of the grandparents and placed the children in the licensed foster home of Mr. and Mrs. Frank Brown of Leslie, Michigan.

Before the October 13 trial could be held, counsel for the natural father entered a motion to dismiss the neglect proceedings on the grounds that the Circuit Court, by reason of a complaint for divorce filed October 20, 1976, by Vickie Smith, had prior and continuing jurisdiction over the children. The Probate Court denied the father's motion to dismiss on August 30, 1977. The father appealed to Circuit Court. The October 13 trial was adjourned, pending the appeal.

In May of 1978, Ellen McKay, the caseworker at that time responsible for the welfare of the children, learned that changed conditions in the Brown home prevented them from continuing to care for the children. Consequently, this caseworker asked the Probate Court to remove the children from the Brown home and to authorize their placement in the foster care of the plaintiffs, Wayne Sherrard and Janet Sherrard of rural Owosso, Michigan, who had just been provisionally licensed by her agency, Family and Child Services of Lansing, Inc., and the Michigan Department of Social Services. As a result, Candace Smith and her sister, Vernita Smith, were placed in the Sherrard home by order[1] entered May 15, 1978. (The Sherrard provisional foster home license was granted initially for six months commencing May 15, 1978.)

On August 23, 1978, the Circuit Court entered its opinion and order affirming the order of the Probate Court holding that it (the Probate Court) had jurisdiction over these children despite the pendency of a divorce proceeding in the Circuit Court. Thereafter, the Probate Court set the matter for further pre-trial on October 16, 1978. At that time, the court set the matter for jury trial to begin on December 18, 1978, a jury having been demanded by counsel for the mother. The trial was adjourned until September 15, 1979.

---

1. The Order reads as follows:
   "In furtherance of an order dated July 15, 1977, and the petition of Ellen McKay, Juvenile Court Officer it now appearing the best interests of said minor(s) and of the parties interested will best be served thereby, IT IS ORDERED that the placement of said minor(s) be and is hereby changed from: Mr. and Mrs. Frank Brown (F.H.) 10604 Preston Road Horton, Michigan 49246

   TO: Mr. and Mrs. Wayne Sherrard 4103 Wilkinson Road Owosso, Michigan 48837 IT IS FURTHER ORDERED that such placement shall continue until the further Order of the Court. Dated: May 15, 1978 /s/ ———————————— DIRECTOR OF CHILDREN'S SERVICES"

On February 14, 1979, the father entered a nolo contendere plea to the petition against him. This plea was accepted by the Honorable Robert J. Barber, a visiting probate judge. Judge Barber then began consideration of the motion of the mother's attorney to withdraw on the grounds that his client had failed to cooperate with him. Judge Barber adjourned hearing of this motion until February 22, 1979, to provide for actual service on the mother and to provide her the opportunity to object to withdrawal. As the mother failed again to appear on February 22, 1979, the court permitted the mother's attorney to withdraw. The court then ordered that alternate counsel be appointed for the mother and that the matter be set for jury trial on the allegations against the mother on March 16, 1979.

On March 16, the mother did appear and the jury trial was held. The jury found from the facts that the allegations in the petition were true and, thereafter, Judge Barber entered his order taking jurisdiction over the children. That still left open the question of what disposition should be made with respect to the children and at the close of the trial, the court set May 29, 1979, as the date for the hearing on the disposition issue. At that time, the mother appeared but the father did not. It was the position of the state at that hearing that termination of the rights of both parents was in the best interests of the children. Judge Owens held that the state had sustained its burden of proof and entered an order on June 12, 1979, terminating the rights of the natural parents in Candace and Vernita

Smith. Both parents, thereafter, were notified of their right to appeal and, also, their right to counsel as well as a right to a complete transcript at no cost if they were indigent. No appeal was perfected from the order terminating parental rights in Candace and Vernita Smith. Likewise, neither parent petitioned for rehearing within the three month period following termination of their rights. Consequently, at the time the present suit was filed in the Federal Court, Probate Court had completed the statutory process for terminating the rights of the parents and, as a result, the court was free to place these children for adoption under the Michigan statute.

Meanwhile, as previously indicated, the children were placed in the Sherrard home on May 15, 1978. The Sherrards had been licensed as foster parents as of that same date. Initially, by virtue of M.C.L.A. § 722.117, a provisional license is issued during the first six months of operation. In this particular case, at the end of the first six months the license was extended for an additional six month period rather than the issuance of a "regular" two-year license. It is apparent that certain emotional and physical problems existed in the Sherrard home during this one year "provisional" period when the Smith girls were in the residence. The Sherrards have one adopted son, William, who at that time was eight and a half years old. He had been adopted at age five and has had severe emotional problems. In a detailed and thoughtful report[2] on the Sherrard home dated January 5, 1979, entitled, "Renewal

<hr />

2.                    RE: Wayne & Janet Sherrard
  WORKER: Peggy Palmiter
  AGENCY: F & CS, Ingham
  DATE: January 5, 1979

RENEWAL STUDY

Wayne and Janet Sherrard were licensed as foster parents with this agency as of May 15, 1978. The Sherrards are a rural family, located in Owosso, Michigan. They reside on a large dairy farm, which is also their total livelihood. Their home is extremely large and old, and they have gradually been remodeling and redoing it. Due to the size of the home, they have been licensed for four children.

Wayne and Janet Sherrard have one adopted son, William, who is 8½ years old. He was adopted at age 5 and has had serious emotional problems. During our licensing process, William seemed to be functioning well and the family was encouraged at his progress. The Sherrard family had received some counseling help following the adoption and all had been involved through Mental Health Services approximately a year ago. It was Mr. and Mrs. Sherrard's opinion, in May, that William was adjusting well and that many of his acting out behaviors had ceased. They felt that he was well integrated into their family and that the introduction of other children into the home was an advantage for him as well as for them.

Study", caseworker Peggy Palmiter report-
ed that the Sherrards had received some

In my discussions with the family, as well as with William, I agreed with their perceptions. Candace and Vernita Smith, 5 and 2 years old respectively, were placed in the Sherrard foster home on May 15, 1978. Both of these children are difficult children in that they have emotional problems and have experienced many changes leading to anxiety and insecurity. The Sherrards have handled the placement of the two children extremely well, in our opinion. We felt that the family has functioned relatively smoothly and that they have dealt with some of the emotional trauma of the girls in an extremely appropriate and understanding manner. In fact, we continue to be impressed with the Sherrards ability to handle children with emotional problems and their ability to persevere under extremely trying circumstances.

On October 10, 1978, this worker received a call from Ann Avellar, from Protective Services in Shiawassee County. Ms. Avellar indicated that William's school had contacted them and filed a suspected child abuse report. The school had indicated that William had substantial bruises on his back and legs. This worker talked at great length with Ms. Avellar, as well as Mrs. McKay, the placement worker from this agency.

On October 11, 1978, I talked with Mrs. Sherrard, both on the phone and in person. She was extremely distressed about the complaint having been filed and was obviously distraught about the situation with William at the present time. She did indicate that William was becoming difficult to control and that she had spanked him with a fly swatter on the day before the complaint was made. She also indicated to me that she had no idea that such a spanking had created the marks that the school was complaining about and did not feel that she had punished him in the extreme in a physical manner.

In my discussions with Mrs. Sherrard, several things became extremely evident. First, it became clear that William has severe emotional problems. It also became very clear that they have received minimal, at best, assistance with these problems. Mrs. Sherrard indicated to me that William has been involved in several behaviors in the last few weeks that worry them immensely. He pounded nails in the side of the camper. He tried to pound a screwdriver in a 220 fuse box. He basically has been involved in many behaviors that cause the family to worry about his physical safety. Hence, it becomes more and more imperative to Mr. and Mrs. Sherrard that he respond when they insist that he cease a particular behavior, since it is their belief that such response may in the very near future be what saves his life.

I use these examples only to point out the degree of concern that the Sherrards have in regards to William's emotional state at the

counselling following the adoption and that the family was of the opinion that the in-

present time. They have continually sought assistance in dealing with this child, i. e. Mental Health Counseling and work with the adoptions worker from the Department of Social Services. In my discussions with them, they have indicated that William was placed to them with minimal post-adoptive supervision, as their placement worker left the agency shortly after William's placement. It is also clear that no subsity was arranged for this adoption and any financial burden incurred in William's need for treatment must be incurred by the Sherrard family. It became very clear to me that they are not in a financial position to afford a great deal of therapeutic help for the child. In view of all of the limitations with in which they were working, I think the Sherrards have done an admirable job and have made every effort to obtain appropriate medical and psychological assistance. However, to expect a family to deal with a child like William, whose background history is extensive, without proper assistance and support is ludicrous. I talked with Mrs. Sherrard throughout the entire process of the P.S. investigation as well as Ms. Avellar. Through this conversations it became clear that there was no major medical finding in regards to William's health. The doctor did indicate that he found bruising and he found bruising that he felt could not have been caused by any other way than having been inflicted upon him. He did indicate that there was no other medical or physical problem however. In my discussions with Ann Avellar and Mrs. Sherrard, we all agreed that an extensive evaluation was necessary for William and that this assistance and evaluation should begin as soon as possible. Through several following contacts, I did learn that an appointment was arranged for Mrs. Sherrard and William to be seen at Michigan State University Clinic.

In attempting to pursue the Protective Services case in this manner, I have had a great deal of difficulty. It is my understanding that Ann Avellar has left the division of Protective Services in Shiawassee County and we have received no copy of the report from Michigan State University. Ms. Avellar's supervisor did indicate that when such a report was forthcoming, he would provide us with a copy. Mrs. McKay, placement worker in this agency, and myself were extremely concerned about the status of the Sherrard family, both in general and as a foster family. We both felt that the removal of the foster children would affect the situation adversely at the present time. William's self image is extremely bad and the removal of the children would be internalized by him and contribute to an already dangerous problem. Also, from the perspective of Candace and Vernita themselves, they have found

troduction of the two Smith daughters had been advantageous to the overall family situation. Nevertheless, it was reported that the Smith girls themselves (not unsurprisingly) had shown evidence of anxiety and insecurity. Initially at least, the caseworker was impressed with the Sherrard's ability to handle the children. Thereafter, the caseworker received a call of suspected child abuse. (A school teacher had reported that the Sherrard boy had exhibited substantial bruises on his back and legs.) Further conference with the Sherrards demonstrated a continuing series of problems with respect to William. He had been involved in several acts of anti-social conduct, such as pounding nails into the side of a camper and attempting to pound a screwdriver in a 220 fuse box. The marks on his back apparently had been caused when he was spanked by Mrs. Sherrard with a fly swatter. Despite the spanking, the caseworker

a somewhat stable positive and nurturing environment, which it was our feeling would be damaging for them to have to relinquish at this time. We began working with the Sherrard family to determine what kinds of supportive services could be offered, both to assist in dealing with William and prevent the removal of foster children.

Ironically enough, Mrs. McKay had begun an adoptive study on the Sherrard family, as they had applied several years ago with the agency, at approximately the same time as the Protective Services complaint was filed. Mrs. McKay has had opportunity to talk with many people who are familiar with the Sherrard family in the course of this adoptive study investigation. The most significant contact that Mrs. McKay has had, up to the present time, is with the school system. Mrs. McKay did talk to the school principal who was involved in the initial filing of the complaint. At first he was hesitant, as he has heard nothing from Protective Services as to the outcome of his complaint. Mrs. McKay indicated that we were aware of that complaint and that we were following through on the complaint. He then talked freely with her about the fact that William is in fact an extremely difficult child and that they have had no other difficulties with the Sherrard family up until this point. As we had received no report on an evaluation of William from Protective Services or Michigan State, word went back to the school that this was something that we felt was necessary. Fred Beach, social worker for the intensively emotionally impaired, has begun working with the family and is beginning to set up testing for William in regards to emotional and organic problems. There's a potential that William will be placed in a special classroom for the emotionally disturbed and Mr. Beach has been extremely helpful to the entire Sherrard family.

At this point, we have made several conclusions in regard to this foster home. First, it would be our recommendation that they remain licensed, with the children that are in their home presently left in placement there. The Sherrards are eligible at this time for renewal from a provisional to a regular license. In my discussions with Mrs. Sherrard and agency personnel, it is my feeling that our best recommendation at the present time would be for a renewal to a second provisional. It is my opinion that the area of non-compliance would be related to rule 15 stating that all members of the family should be in such physical and mental health as will not adversely affect the health of the child or quality or manner of his care. At this point, it is our feeling that we are unclear about the emotional stability and health of William and how that is affecting the entire functioning of the Sherrard family. It's true, in our opinion, that William does have serious emotional difficulty, but it is also our opinion that what course of action is going to result in the best benefits for all concerned around that emotional stability is still an issue. Therefore, it is our recommendation that this family be licensed with a second provisional license in order to more fully evaluate and look at William's difficulty and the appropriate kinds of courses of action to assist both William and his family. I am aware that a recommendation to a second provisional necessitates an intention to correct letter, which Mrs. Sherrard has indicated she is totally willing to sign. The letter would basically cover the types of work that will be done with the family and with this agency between now and six months from now.

_Peggy Palmiter MSW_

Peggy Palmiter, MSW
Caseworker: (jh)  1-5-79
Reviewed by: _____ MSW  Date 1-5-79

continued to be supportive of the Sherrards in their efforts to obtain assistance and counseling in the handling of William. However, due to their limited financial resources, she concluded that it would be impossible to expect any major improvement in William's behavior without further expensive counseling and assistance, but which services did not appear to be available. The January 5 report concluded by pointing out that the six month provisional license was about to expire (technically it expired on November 15, 1978) but since Rule 15 of the agency's regulations requires that "all members of the family should be in such physical and mental health as will not adversely affect the health of the child or quality or manner of his care", a serious doubt existed whether the Sherrard home met the standards for a permanent license. Consequently, it was recommended that the provisional license be extended for an additional six month period "in order to more fully evaluate and look at William's difficulty and the appropriate kinds of courses of action to assist both William and his family." The report concludes that the Sherrards were advised that a second six-month extension of the provisional license required an "intention to correct" letter which Mrs. Sherrard was willing to sign. The provisional license presumably on the recommendation of Ms. Palmiter's report was extended to May 15, 1979. However, as the May 15 deadline approached, the then caseworker in charge, Mary Ellen Heater, became progressively concerned with the Sherrard home. On May 12, 1979, Ms. Heater obtained an ex parte order from Donald S. Owens, Judge of Probate, changing the placement of the children from the Sherrard home to that of Mr. and Mrs. Edward Campbell of Lansing, Michigan. In her petition, Ms. Heater alleged that it was her judgment that it would be in the best interests of the children to be removed from the home of the Sherrards "because of adjustment problems on the part of the Sherrard son" and further because her agency was not recommending renewal of the Sherrard's provisional foster care license. The language in the petition signed by Mary Ellen Heater and approved by her supervisor, Lucille K. Barber, reads as follows:

> "Because of adjustment problems on the part of the Sherrard's son, Family and Child Service is not recommending renewal of this family provisional foster care license. License expires 5–14–79."

Following the issuance of the order of removal dated May 15, 1979, the Smith girls were moved to the foster home of Mr. and Mrs. Edward Campbell.

It should be noted that at the time the Smith sisters were initially placed in the Sherrard home a written contract was entered into between Mr. and Mrs. Sherrard and the placement agency, the Child and Family Services of Michigan, Ingham County Branch. Among other provisions in this agreement, the Child and Family Services of Michigan agreed to assume the responsibility "to determine permanent plans for the child and to work out plans with natural and adoptive parents." [3]

---

3. CHILD AND FAMILY SERVICES OF MICHIGAN

~~Ingham County~~ BRANCH
AGREEMENT WITH FOSTER PARENTS

As foster parents for children under the supervision of Child & Family Services of Michigan we agree to the following:
I. Responsibilities of Foster Parents:
A. We will keep all information concerning the child and his family CONFIDENTIAL.
B. As long as we are licensed by Child And Family Services of Michigan we will not take a child from any other source without permission of Child And Family Services of Michigan.
C. When the child becomes ill or suffers a physical injury we will notify the agency. In a situation of emergency we will seek medical care from the child's regular physician if possible, otherwise we will use the best medical service available and we will contact the agency promptly.
D. As foster parents, one of us will accompany the child for doctor's appointments.
E. We will provide:
(1) Shelter and food, including formula.
(2) Care and Supervision 24 hours per day.

Following the removal of the children from the Sherrard home on May 14, 1979, the Sherrards, through their attorney, filed with the Department of Social Services a formal administrative hearing complaint against Family and Child Services of the Capitol Area, Inc. In their-complaint, the Sherrards claim (1) the children had been removed because the agency had difficulty serving children in foster homes in Owosso; (2) the agency arbitrarily and capriciously reversed their prior plans to keep the children in the Sherrard home; (3) the children were abruptly moved without adequate explanation and without consideration of the children's needs and (4) the agency abused fair licensing practices in not providing the Sherrards with license renewal application nor advising them of the legal basis for the recommended change in their license status. Upon receipt of the complaint, David Fitzgerald, Director of Family Home Licensing Division, arranged for an informal conference in his office on June 13, 1979, at which time the Sherrards appeared with their attorney. Thereafter, an investigation was undertaken and in a report dated August 31, 1979,[4] Jerome L. Liebrecht, Consultant

(3) The necessary home equipment and supplies such as, furniture, laundry, bedding and toilet articles such as soap, lotion, powder etc.

II. Responsibilities of Child And Family Services of Michigan.

A. To determine permanent plans for the child and to work out plans with natural and adoptive parents.

B. To provide consultation, support and assistance to foster families while the child is in foster care.

C. To pay the foster parents_____for each night a child is in their home. (Payments to be made monthly)

D. To pay for clothing, medical care, prescriptions (including vitamins) bottles and nipples and any special equipment which is necessary due to an individual child's needs.

*Janet Sherrard*
Wife

*Wayne Sherrard*
Husband

*Peggy Palmiter*
C. F. S. A. Representative

4-11-78
Date
FC-14

---

4.

STATE OF MICHIGAN

WILLIAM G. MILLIKEN, Governor

DEPARTMENT OF SOCIAL SERVICES

300 South Capitol Avenue, P.O. Box 30037, Lansing, Michigan 48909

JOHN T. DEMPSEY, Director

August 31, 1979

Mr. Kenneth Phelps, Acting Director
Family & Child Services of the Capitol Area
300 North Washington Avenue
Suite 102
Lansing, Michigan 48933

Dear Mr. Phelps:

As you have been made aware, allegations have been made that Family & Child Services of the Capitol Area has violated administrative rules for child placing agencies. These allegations were made by Wayne and Janet Sherrard through their attorney, Gerald M. Stevens and were received in my office on June 22, 1979. Act 116, P.A. of 1973, as amended, "An act to provide for the protection of children" requires the Michigan Department of Social Services to investigate allegations of violations of administrative rules for child care organizations, including child placing agencies. The Division of Child Welfare Licensing investigated the allegations made in this case on June 25 and 26, 1979. These allegations and the findings of the complaint investigation follow.

1.) *Allegation*: Mr. Stevens has reason to believe that the children were removed because the agency has difficulty serving children in foster homes in Owosso. The community is too far distant from the agency headquarters.

*Finding*: A review of this case did not support the allegation that the community was too distant from the agency for the children to receive service. The agency was found in compliance with administrative rule 400.143 which requires that the agency clearly define its purpose and functions and the geographic area to be served.

to Children's Agencies, rejected each of the Sherrard's charges. In essence, Liebrecht found the decision to remove the children had been based on significant and substantial information; that the decision of removal was a "reasonable one" and in compliance with Administrative Rules; that the children's needs were paramount in the removal decision and further that the removal was neither arbitrary nor capricious, but to the contrary, the actions were "considered and planned". The report concluded that the Family and Child Services of the Capitol Area, Inc., did not violate any of the department's administrative rules, and that its regular license for placement of children in private homes for foster care and adoption be continued. Thereafter, the

2.) *Allegation*: (A) Mr. Stevens contends that the home conditions had not changed and that the agency arbitrarily and capriciously reversed their prior plans to serve the children in the Sherrard home.

*Finding*: The evaluation disclosed that the decision to remove the children was in fact based upon significant and substantial information which supported the agency's decision. Based on the information the agency had on the children and the foster family, the decision to remove the two foster children was a reasonable decision and the agency is therefore in compliance with administrative rule 400.158(d) which requires that the agency evaluate the past experiences and problems of the child to determine the placement or service best suited to meet his needs. This documentation was found to comply with the requirements of administrative rule 400.172 which requires that the agency maintain foster home records including periodic reevaluations of the foster home.

*Allegation*: (B) The Sherrards had been verbally advised of approval for adoptive placement and that the agency did not follow through with such a placement.

*Finding*: There was no record of administrative approval by Family & Child Services administration of an evaluation for adoptive placement into this home. The home cannot be considered approved for adoption without such approval. Thus, there is no violation of administrative rule 400.162(4) which requires that an agency not make a placement for adoption unless an evaluation of the child has been made and recorded. An evaluation is not considered approved or denied without agency administrative approval.

3.) *Allegation*: Mr. Stevens contends that the children were abruptly moved without adequate explanation and without consideration of the children's needs.

*Finding*: The case record indicates that the children were not abruptly moved without adequate explanation and without consideration of the children's needs. Therefore, the agency is in compliance with administrative rule 400.158(2), relating to preparation of children for placement changes and the sharing of information with the children as appropriate for their ages.

4.) *Allegation*: Mr. Stevens contends that the agency abused fair practices that he feels must be embraced in licensing rules and statutes. The children were removed on the day of license expiration with an explanation that the children could not remain in an unlicensed home. The Sherrards were not provided with license renewal applications nor were they clearly informed of the legal base for any recommended change in their license status.

*Finding*: The evaluation did not disclose any arbitrary and capricious actions on the part of the agency, but rather the actions were considered and planned. Other issues raised in the allegation are beyond the scope of child placing agency rules and therefore were not considered in the investigation as being within the authority of this Division.

It is, therefore, the conclusion of the Division of Child Welfare Licensing that Family & Child Services of the Capitol Area did not violate administrative rules for child placing agencies relating to the allegations made in this complaint. Therefore, it is recommended that the regular license for Family & Child Services be continued for placement of children in private homes for foster care and adoption.

Thank you for your cooperation in this investigation. Please contact me if you have questions relative to these findings or the recommendation.

Sincerely,

/s/ Jerome J. Liebrecht
Consultant to Children's
Agencies

JJL/di

cc: Gerald M. Stevens, Attorney
Larry D. Miesner, Supervisor
Division of Child Welfare Licensing

Sherrards received a certified letter [5] under date of September 14, 1979, from John T. Dempsey, Director of DSF, advising them that he concurred in the recommendation of the Family and Child Services of the Capitol Area, Inc. that the Sherrard license to operate a foster family home not be renewed. In his letter, he enclosed a copy of

the licensing report, Act 116 of the Public Acts of 1973, and the licensing rules for foster homes and, in addition, advised the Sherrards of steps they could take to appeal the Department ruling.

On August 17, 1979, the Sherrards filed a petition in the Probate Court, Ingham County, Michigan, seeking a review and

[5]

STATE OF MICHIGAN

WILLIAM G. MILLIKEN, Governor
DEPARTMENT OF SOCIAL SERVICES
300 South Capitol Avenue, P O Box 30037, Lansing, Michigan 48909
JOHN T. DEMPSEY, Director

September 14, 1979

CERTIFIED MAIL

Mr. and Mrs. Wayne Sherrard
4103 E. Wilkinson
Owosso, Michigan 48867

Dear Mr. and Mrs. Sherrard:
The Family and Child Services of the Capitol Area, Inc. has recommended that your license to operate a foster family home not be renewed. I have reviewed their report carefully and agree with the recommended action.

This letter will serve as the Department's official notice of refusal to renew action which is based on the following violations:

Rule R400.193(15) Regarding the requirement that all members of the household be in such mental health as will not adversely affect a foster child.

Rule R400.193(16) Regarding the requirement that relationships within the family shall be such that a wholesome atmosphere will be assured for foster children.

Rule R400.193(17) Regarding the requirement that foster parents shall be of suitable temperament to care for children, shall understand the needs of children, and shall be willing to cooperate fully with the supervising agency.

Rule R400.194(33) Regarding the requirement that child training shall be handled with sympathy and understanding. Severe corporal punishment shall be a basis for license revocation.

Concerning Rule R400.193(15), the report states that noncompliance is based on information gathered from several sources. The EPPC (Educational Planning and Placement Committee) report dated June 5, 1979 done by the Shiawassee Intermediate School District, diagnoses your adopted son William as emotionally impaired. A report from Dr. R. E. Harder, MSU Pediatric Psychology Intern, dated March 9, 1979, recommended individual therapy for William and therapy for Mrs. Sherrard focusing initially on parenting but moving toward other concerns she may have. A report from H. C. Tien, M.D., dated June 15, 1979, recommends both individual and family therapy for a trial period of three to six months at which time is

to be reassessed, and possible continuation of therapy for one to three years.

Concerning Rule R400.193(16), the report indicates that three separate people were advised by you that, when problems arose with William that affected the placement of your foster children, you were willing to relinquish the guardianship of William.

Concerning Rule R400.193(17), the report finds that you are unwilling to abide by all terms of the agreement you had with the licensing agency in regard to the issuance of your second provisional license, November 15, 1978. Additionally, you did not follow through on appointments at Michigan State University and Shiawassee County Mental Health Center.

Concerning Rule R400.194(33), the agency reports that on one known occasion you had disciplined William so severely that bruises resulted and those bruises were verified by a doctor in the emergency room of Owosso Memorial Hospital.

These serious and substantial deficiencies lead me to the conclusion that I have no other recourse at this time but to refuse to renew your foster home license. A copy of the licensing report, Act 116 of the Public Acts of 1973, as amended, and the licensing rules for foster homes are enclosed for your information.

If you do not agree with this decision, you may request a hearing by writing the Bureau of Administrative Hearings, 1000 Long Boulevard, Suite 14, P. O. Box 30041, Lansing, Michigan 48909, within thirty (30) days of your receipt of this letter. If you have any questions, please contact Family and Child Services of the Capitol Area, Inc.

Sincerely,
/s/ John T. Dempsey

JTD:DGF/kd
enclosures
cc: Harold S. Gazan, Director, Bureau of Regulatory Services
David G. Fitzgerald, Director, Division of Family Home Licensing
Marilyn Mikel, Consultant, Division of Family Home Licensing
Robert Bee, Director, Division of Child Welfare Licensing
Ken Phelps, Interim Director, Family & Child Services of the Capitol Area, Inc.
Barbara McLean, Licensing Worker, Family & Child Services of the Capitol Area, Inc.
Gerald Stevens, Attorney
Erika Weiss, Assistant Attorney General

reversal of the decision to remove the children from the Sherrard home. Thereafter, the Sherrards moved to disqualify Judge Donald S. Owens, the Probate Judge, which motion was denied. On August 27, a hearing was held, although the Sherrards claim the Court refused to hear them on the basis that as foster parents they had no standing. The Probate Court (under Order dated September 10, 1979) dissolved its earlier order wherein it had placed the care and custody of the two Smith girls with DSS. The effect of this order was to reinstate the Probate Court's full authority over Candace and Vernita Smith. In addition, the Probate Judge ordered (1) that two new caseworkers be assigned to the case to investigate "the minors' circumstances and make recommendations to the court as to their placement and (2) that the minors receive psychological evaluation." Thereafter, the matter was adjourned by the Judge "for review" to April 10, 1980. In addition, Judge Owens had refused to rule on the Sherrard's motion "until this court's authority to rule on them is clarified by the Federal District Court." In summary, as of this date, the following facts appear uncontroverted:

(1) Candace and Vernita Smith are presently in a "neutral" foster home and no one claims that this home is not satisfactory or that the children are not receiving good care;

(2) The Sherrards have appealed the loss of their foster home license, which appeal (within the DSS) was to have been heard on October 29, 1978, but at the Sherrards' request, was adjourned to a later, unspecified date;

(3) The Probate Court has declined to hold a hearing on the Sherrard motion to review the removal decision apparently because of Judge Fox's temporary restraining order and "until the court's authority to rule on them is clarified by the Federal District Court." However, Judge Owens ordered on October 25, 1979, that "said matter be and is hereby set for review before the Hon. Donald S. Ownes, Judge of Probate on April 10, 1980, 10:30 o'clock in the forenoon;

(4) The court appointed guardian ad litem, Timothy G. Holland, has consistently supported the decision of the DSS in removing the two Smith sisters from the Sherrard home.

## II.

First of all, as of this date, it appears that plaintiffs have already pending in the Michigan Probate Court a hearing date on their petition to review the decision of the removal of the foster children from their home. Likewise, an administrative hearing within the DSS on the issue of the termination of their foster home license is also pending. Until these matters have been heard, decided and appealed, resort to this court appears premature. However, plaintiffs claim they already have been advised by the Judge of Probate that as foster parents they have no standing in his court to contest the removal decision and, further, the children in the meantime could be placed for adoption. In addition, because of a temporary restraining order issued last summer by Judge Fox, state officials are uncertain how and if they should proceed. Consequently, I am satisfied it will be in the best interest of all parties, especially the two foster children, for this court to face up to the substantive issues raised by the parties in the pleadings, their briefs and at oral argument.

Plaintiffs claim a constitutional right to a hearing on the removal of the two Smith sisters from plaintiffs' foster home. Or, stated another way, they claim there exists in this case a "liberty interest" between themselves as foster parents and the foster children which the state may not impair without due process.

Before attempting to decide that question, it is important to make several general observations about this case. First of all, no two families are alike and to establish rules or guidelines applicable to all foster home situations would not only be unwise, but foolhardy. Likewise, of course, it is not always clear just what, in fact, does constitute a "family". The cases frequently em-

phasize the biological relationship and yet it is common knowledge that attachments may be stronger and more meaningful in other types of relationships. Certainly another important factor in assessing adult/child relationships is the expectation of the parties at the time the relationship commences. As a part of this consideration would be the age and previous living experience of the particular child prior to entering into a foster home environment. In the present case, the two Smith girls had lived not only with their natural parents and their grandparents, but also another foster home prior to entering into the Sherrard foster home. This is not a situation where the foster children had been placed in foster care as infants. Nor is it a case where the foster children had never known their natural parents and had remained continually for several years in the care of the same foster parents. On May 15, 1978, when these sisters were placed in the Sherrard home, Candace was five and Vernita was two. It is important to note that the placement of the children in the Sherrard foster home was by virtue of a written contract between the Sherrards and the placement agency. The contract provided that the placement agency would assume responsibility for determining "permanent plans for the child (children) and to work out plans with natural and adoptive parents." Also, at the time the children were placed in the foster home, the Sherrards were given, under Michigan law, only a provisional, six-month foster home license, which by its very name negates permanency. In addition, when the six-month "trial" period terminated, the agency expressed concerns about the family environment due to emotional problems of the young Sherrard boy, who also was living in the Sherrard home and, as a result, the provisional license was extended an additional six months rather than the customary granting of a permanent two-year license. Added to this is the fact that the Sherrard boy, during the year in question, was a constant source of very serious problems to the Sherrards which not only required the need of outside professional counselling, but involved an unfortu-nate report made by a teacher at school involving alleged child abuse. All of the facts negate any reasonable expectation on the part of the Sherrards that they were acquiring or had in fact, acquired some constitutionally protected interest in having the Smith children remain in their home.

Although not clearly articulated either in the pleadings, affidavits or briefs, the plaintiffs appear to be arguing that during the year the Smith girls were in residence in their home, a mutual feeling of love and dependence developed to such an extent that plaintiffs are now entitled to the generally-acknowledged parental rights normally afforded to biological families.

This issue was squarely before the United States Supreme Court in *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). The Supreme Court discussed at length foster family living arrangements, but then did not find it necessary to decide whether the "familial right to privacy" which is protected by the Fourteenth Amendment extends to foster parents. The case arose out of New York. The court reviewed in detail the procedures required under New York law before a foster child could be removed from its foster parents and concluded that the procedures were, in fact, adequate to protect whatever liberty interests the foster parents might have.

Subsequently, the Fifth Circuit was faced with the same issue in *Drummond v. Fulton County Department of Family & Children's Services, et al.*, 547 F.2d 835 (5th Cir. 1977). *Drummond* involved a biracial placement. The child was only one month of age when placed in the Drummond home. Evidence existed that strong emotional ties developed between the foster parents and the child. Further, the child was in the Drummond home in excess of two years prior to being placed in another foster home. The appellate panel which originally heard the case concluded that foster parents do, in fact, have a valuable liberty right which cannot be deprived them by the state without a due process hearing. The full court, however, on rehearing *en banc* 563 F.2d 1200

concluded that under the circumstances of that particular case "there is not such constitutionally protected interest". The court pointed out that, under Georgia law, which created the foster relationship in the first place, there was no basis whatsoever for a justifiable expectation that the relationship would be anything but temporary. The court then pointed out, at page 1207:

> "True liberty rights do not flow from state laws, which can be repealed by action of the legislature. Unlike property rights they have a more stable source in our notions of intrinsic human rights. The very fact that the relationship before us is a creature of state law, as well as the fact that it has never been recognized as equivalent to either the natural family or the adoptive family by any court, demonstrates that it is not a protected liberty interest, but an interest limited by the very laws which create it. See *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)."

See also *Kyees v. County Department of Public Welfare of Tippecanoe County*, 600 F.2d 693 (1979). In that case, the defendant agency placed a small infant with Charles and Pauline Kyees, duly licensed foster parents in Indiana. Again, the child was less than one year old and was with the Kyees family for a period in excess of two years. It is also clear from the record that the Kyees developed a strong emotional attachment to the child and began to express an interest in adopting him. However, Mr. Kyees was 66 and his wife 50, which was one of the principal reasons that the agency opposed the adoption. After the child was removed from their home, the foster parents brought suit alleging deprivation of constitutional rights in the removal of the child from their home. The court reviewed both *Smith* and *Drummond* in some detail and, like *Drummond*, concluded that "the question left open by the Supreme Court in *Smith* should be decided adversely to the existence of a liberty interest in a foster care arrangement of the nature and duration considered here." The court stated that critical to the Kyees claim of due process was whether or not the Kyees along with their foster child had achieved the status of a "family". In ruling that no "family" protected rights had accrued, the court concluded, under Indiana law that "in this case the likelihood or virtual certainty of eventual termination of the foster relationship is made clear in state statutes and in the contracts executed by the foster parents." The court also concluded that because of the contractual arrangement, the foster parents at all times had reason to believe the adoption agency reserved the right to terminate the relationship.

### III.

■ From all the evidence in the present case, I find that the Sherrards had no reasonable expectation of continued licensing as a foster home or that a liberty right had developed or accrued during the year in question which would be protected from state intervention by the Due Process Clause of the Fourteenth Amendment. The only foster home license the Sherrards ever received from the state was a "provisional" license. The licensing statute defines a provisional license as "a license issued to child care organization which is temporarily unable to conform to all of the rules promulgated under the authority of this act." M.C.L.A. § 722.111(g). The statute provides that a provisional license shall expire six months from the date of issuance and may be issued not more than four times. M.C.L.A. § 722.117. Further, the statute provides "the issuance of a provisional license shall be contingent upon submission to the department of an acceptable plan to overcome the deficiency present in the child care organization within the time limitations of the provisional licensing period." M.C.L.A. § 722.117. To date, no plans for overcoming the deficiency with respect to mental health problems in the Sherrard home has been advanced by the Sherrards. The Sherrards knew the children could not remain with them in the absence of a valid state foster home license. The problems in the family which made the license provisional in the first place continued unabated throughout the entire year. In addition as

already pointed out (1) the children were not infants; (2) they knew other "parents" then the Sherrads; (3) they were with the Sherrards only one year; (4) the contract with the placement agency by its very terms places the responsibility of "permanent" plans for the Smith daughters upon the adoption agency, not the Sherrards; (5) the Sherrards were advised of the agencies' concern about the mental stability of the Sherrard boy and what affect his condition might have upon the two foster girls. Consequently, any expectation of "family" continuity or permanency based upon the provisional foster family license held by the Sherrards was totally unreasonable and cannot support a claim of denial of due process when the license was revoked and the children removed from the home.

■ And, finally, even assuming a constitutionally protected interest in the Sherrards, I am satisfied that the Michigan procedures for revoking a foster home license are constitutionally adequate and meet the criteria set forth in *Smith, supra*. As previously pointed out, Michigan laws apply to foster home licensing rather than foster home removal. However, the result is the same. An adverse ruling to foster parents under either theory brings about a removal of the child from the home. Consequently, the rights of the foster parents are adequately protected whether the claim against them has to do with removal of the children or whether the claim is made that the license should either be revoked or not renewed. DSS is the licensing authority and responsible for the development of rules for the care and protection of children in organizations covered by the Michigan statute. M.C.L.A. § 722.112. Independent agencies like FCS make recommendations to DSS. Provisional licenses, such as the one plaintiffs had, may be granted when the foster parents are in temporary non-compliance with agency rules, but such a license expires six months after issuance (M.C.L.A. § 722.117).

MCLA § 722.121 [6] provides that DSS may revoke, refuse to renew, or modify a provisional license when the licensee is in violation. The DSS must notify the licensee in writing. This notice advises the licensee that if he objects, he may appeal to the department within 30 days. If appealed, the department must conduct a hearing. The licensee may present witnesses in evidence. The department must render a decision within ten days after the hearing. M.C.L.A. § 722.122 provides the licensee may appeal the decision to the state circuit court within 30 days. The court has authority to set aside the revocation, or order the issuance or renewal of the license, as the case may be.

---

**6.** "722.121 * * * (2) * * * A license shall not be revoked, a renewal thereof shall not be refused, an application for a license shall not be denied, or a regular license shall not be modified to a provisional status unless the licensee, or applicant is given notice in writing of the grounds of the proposed revocation, denial, modification, or refusal. If revocation, denial, modification, or refusal is appealed with 30 days of receipt of the notice by writing addressed to the director of the department, the director or his designated representative shall conduct a hearing at which the licensee, or applicant may present testimony and confront witnesses. Notice of the hearing shall be given to the licensee, or applicant by a personal service or delivery to the proper address by certified mail not less than 2 weeks before the date of the hearing. The decision of the director shall be made not more than 10 days following the hearing, and forwarded to the protesting party by certified mail not more than 10 days thereafter. If the proposed revocation, denial, modification, or refusal is not protested, the license may thereupon be revoked or the application therefor or the renewal thereof refused."

"722.122 *Judicial review.* Sec. 12. A person aggrieved by the decision of the director following the hearing under section 11 of this act may, within 30 days after receipt of the decision, take appeal to the circuit court of the county in which the person resides by filing with the clerk of the court an affidavit setting forth the substance of the proceedings before the department and the errors of law upon which the person relies, and serving the director of the department with a copy of the affidavit. The circuit court shall thereupon have jurisdiction to hear and determine questions of law involved in the appeal. If the department prevails, the circuit court shall affirm the decision of the department; if the licensee, or applicant prevails, the circuit court shall set aside the revocation, or order the issuance or renewal of the license as the case may be."

The defendants in this case have substantially complied with these provisions. The Sherrards were granted a provisional license and told that they were in non-compliance. That license carried an expiration date of May 15, 1979. Although the exact form of the notice to the Sherrards that the license would not be renewed is not clear from the evidence, there can be little doubt that the Sherrards had actual notice that the department did not plan to renew the foster home license. Also, as previously pointed out, Mr. Dempsey sent the Sherrards a letter (after removal of the children and after a hearing) informing them of the DSS decision not to renew their license. He stated the department's reasons and informed them of their right to appeal.

As a practical matter in the facts of this case it makes little difference that Michigan laws apply to licensing rather than to removal since the two foster girls were removed from the foster home on the day the Sherrards' license expired. What New York law provides that Michigan laws do not is notice and a hearing before removal. Michigan law provides notice before a change in the license. The fact that the children were physically removed before an administrative hearing was held is immaterial to the rights of the Sherrards. What is important is the statutory right of the foster parents to a hearing, to have their lawyer present, to present evidence and to appeal an adverse decision to the state circuit court. The children remained at all times in the county and had there been a reversal of the decision to revoke the license, the children were physically available for return to the Sherrards' home.

As the *Drummond* court stated, *Smith, supra,* does not mandate the New York model as constitutionally necessary in every case. Not even in the New York system is removal stayed pending appeal to the department's decision unless the child has been with the foster parents 18 months or more.

It is the opinion and holding of this court that Michigan laws are constitutionally adequate to protect the interests of these foster parents, even assuming they have a constitutionally protected "liberty interest".

Defendants' motion to dismiss treated by this court as one for summary judgment pursuant to Fed.R.Civ.P. 12(b) and 56 is granted. The plaintiffs have failed to state a claim upon which relief can be granted. Likewise, this court's Restraining Order of August 23, 1979, as amended November 1, 1979, is dissolved.

SO ORDERED.