Dorothy RIVERA, individually and on behalf of all others similarly situated, Plaintiff-Appellee,

v.

Marc MARCUS, Commissioner of Children and Youth Services of the State of Connecticut and John F. Harder, Acting Commissioner, State Welfare Department, Defendants,

Marc Marcus, Commissioner of the Department of Children and Youth Services, Defendant-Appellant.

No. 189, Docket 82-7311.

United States Court of Appeals, Second Circuit.

Argued Oct. 14, 1982.

Decided Dec. 23, 1982.

Robert A. Nagy, Asst. Atty. Gen., State of Conn., Hartford, Conn. (Carl R. Ajello, Atty. Gen., State of Conn., Hartford, Conn., of counsel), for defendant-appellant.

Deborah S. Freeman, Connecticut Civil Liberties Union Foundation, Hartford, Conn. (Sue Ann Shay, Neighborhood Legal Services, Hartford, Conn., of counsel), for plaintiff-appellee.

Patrick Malone, Yale Law School, New Haven, Conn. (Stephen Wizner, P.J. Pittman, John L. Pottenger, Jr., Mary McCar-

thy, Jerome N. Frank, Legal Services Organization, Susan Casey, Yale Law School, New Haven, Conn., of counsel), court-appointed counsel for the minor children.

Before KAUFMAN, MESKILL and FAIRCHILD,* Circuit Judges.

MESKILL, Circuit Judge:

We are asked in this appeal to determine whether the procedures used by the State of Connecticut to remove children from foster homes comport with due process. The district court found that the appellee, Mrs. Dorothy Rivera, who was both custodial relative and foster parent to the two children living in her home, should have been provided with greater due process protections when the state removed these children. We affirm.

I. *Background*

Most state administrators and jurists are reluctant to order a child removed from the family home. Court decisions reflect this general sentiment, which is premised on our strong national tradition supporting the integrity and independence of the family unit. *See Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *see also Wisconsin v. Yoder,* 406 U.S. 205, 231–32, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972); *Meyer v. Nebraska,* 262 U.S. 390, 399–400, 43 S.Ct. 625, 626–627, 67 L.Ed. 1042 (1923). Unfortunately in some situations there are instances of serious parental neglect or physical abuse requiring the state to intervene to protect the best interests of the child.

The decision to remove a sibling from the family home is always serious and the resulting disruptions can often be traumatic for both parent and child. The courts have recognized the grave nature of this decision and have consistently ordered that natural parents be afforded due process protection to ensure that a child is not removed without good cause. *See Stanley v. Illinois,* 405

U.S. at 651, 92 S.Ct. at 1212. *See generally Santosky v. Kramer,* 455 U.S. 745, 752, 102 S.Ct. 1388, 1393, 71 L.Ed.2d 599 (1982); *Lassiter v. Department of Social Services,* 452 U.S. 18, 24–32, 101 S.Ct. 2153, 2158–2162, 68 L.Ed.2d 640 (1981). We are less certain whether these procedural protections should extend to foster parents. Although foster parents often provide the same care, love and support expected of natural or adoptive parents, the foster relationship is frequently of shorter duration and is carefully circumscribed by a contract which typically authorizes the state to remove a child from the foster home at any time.

This appeal presents claims that do not fit neatly into the bodies of law governing the rights of either foster or natural parents. Indeed, the parental status of the appellee Dorothy Rivera can be characterized most accurately as hybrid: she is the adult half-sister of Esther Jean Ross and Edwin Ross and was principally responsible for the care and upbringing of the Ross children until the State of Connecticut interceded in 1974. From this perspective, she more closely resembles a natural parent. However, Dorothy Rivera was also a foster parent to the Ross children by virtue of a contract she signed with the State of Connecticut in 1972. The issue presented on appeal is whether a custodial half-sister who also happens to be a foster parent should be treated for purposes of procedural due process as a natural parent or a foster parent. We begin our analysis by reviewing the evolution of the kindred relationship between Mrs. Rivera and the two Ross children.

A. *Family Relationship*

In 1968, Betty Jean Ross and her infant daughter Esther Jean moved from Virginia to live with Mrs. Rivera in Hartford. In 1970, Betty Jean gave birth to another child, Edwin Ross. Mrs. Ross and her two children continued to live with Mrs. Rivera

---

* Honorable Thomas E. Fairchild, United States Circuit Judge for the Seventh Circuit, sitting by designation.

throughout this period. Mrs. Rivera is related biologically to the Ross children because they share the same father. She is, however, much older than her half-brother and sister.

Betty Jean Ross experienced psychological problems rendering her unable to care fully for the needs of her children well before she moved into the Rivera home. Mrs. Rivera stepped into this parental void almost from the moment the Ross children entered her home. The record suggests that she performed her duties as "surrogate mother" capably and with affection. The record also indicates that Mrs. Ross specifically asked Dorothy Rivera to care for her children and was amenable to the delegation of responsibilities in this extended family.

In 1972, Betty Jean Ross was committed to an institution due to her deteriorating mental condition. The Juvenile Court of the State of Connecticut assumed jurisdiction and ordered legal custody of the Ross children transferred to the State Welfare Department. Mrs. Rivera was not notified of the pendency of this Juvenile Court proceeding and was not present when the state assumed legal responsibility for the Ross children.

Representatives of the Connecticut Welfare Department subsequently asked Mrs. Rivera whether she would be interested in serving as a foster parent for the children. Mrs. Rivera agreed to this arrangement and the foster contract was signed on January 14, 1974. Under its terms, Dorothy Rivera agreed to provide familial care and services in exchange for monthly compensation from the state.[1] The Welfare Department expressly reserved in the agreement the right to remove the children from the Rivera foster home at any time. *See* J.App. at 52–53.[2]

On November 14, 1974, the Connecticut Welfare Department notified Mrs. Rivera that the state had decided to exercise its right to remove the Ross children. At this point, Esther Jean and Edwin Ross had been living continuously with Mrs. Rivera for approximately six years.[3] Before removing the children, the State Welfare Department informed Mrs. Rivera that she was entitled to an "Administrative Case Review" (ACR) if she wished to contest the decision of the state agency. Mrs. Rivera indicated that she did wish to challenge the removal decision and asked that her attorney be present. This request was denied pursuant to the regulations adopted by the Commissioner of the State Welfare Department. *See* J.App. at 48.[4]

The ACR hearing was held on December 16, 1974. The three person panel decided without explanation that the Ross children should be removed from the Rivera home. Two days later the children were removed and were subsequently placed in another foster home where they presently reside.[5] Mrs. Rivera has neither been permitted to communicate with her half-brother and sister, nor been informed of the location or identity of the new foster parents.

---

1. Mrs. Rivera received a grant of $86.25 per month for each child. To supplement her foster parent benefits, the plaintiff also received a monthly stipend under the federal Aid to Families with Dependent Children program, 42 U.S.C. § 601 *et seq.* (Supp. IV 1980) (AFDC). AFDC officials granted Mrs. Rivera the status of supervising relative to enable her to receive benefits on behalf of Esther Jean and Edwin. 42 U.S.C. § 606(a).

2. This "right of removal" is a standard provision in every foster care agreement, *see* J.App. at 52–53, and affords the state flexibility to return a child to the natural parents, to unite the child with his adoptive parents, or to remove the child from a hostile environment.

3. Esther Jean moved into the Rivera home shortly after her birth in 1968. Edwin lived with Mrs. Rivera from his birth in 1970 to the date when the state removed both children, December 18, 1974.

4. In 1975, the responsibility for Connecticut's foster parent program was transferred to the Department of Children and Youth Services (DCYS). Thus, any reference after 1975 to the "Commissioner" should be understood to be the Commissioner of DCYS.

5. The State of Connecticut notes in its brief that the foster parents who have been responsible for the Ross children since 1974 have decided to commence proceedings in an effort to adopt Esther Jean and Edwin.

B. *Administrative Case Review Procedures*

To decide this appeal, which focuses on the procedures used by the State of Connecticut to determine when a child should be removed from a foster home, it is necessary to review carefully the general policies and specific administrative regulations governing this process.

In 1972, the Connecticut Welfare Commissioner developed and implemented an "Administrative Case Review Demonstration Project." *See* J.App. at 46. The purpose of this project, as explained in the preface to the regulations, "was to assure that those children under the supervision of the Commissioner of Welfare are not removed from an approved foster home unless it is clearly in the best interests of those children." *Id.* Consistent with this policy, the ACR regulations provide a detailed, albeit informal, set of procedures ostensibly designed to encourage reasoned decisionmaking.

ACR regulations provide that any foster parent can contest the decision of the Welfare Department to remove a foster child if that foster parent believes removal is not in the child's best interest. At the administrative hearing, the Welfare Department is represented both by the social worker responsible for the foster child and either a department supervisor or program supervisor. *Id.* The hearing panel is comprised of three individuals: a district office social worker; a trained social worker from a private casework agency; and a representative from the Welfare Department's "Central Office" who possesses a Master of Social Work degree and who has experience in the child welfare field. The Connecticut Child Advocacy Center represents the interests of the foster child during this proceeding.

The rights of the foster parent during the administrative proceeding are carefully circumscribed by state regulation. The foster parent is neither permitted to bring legal counsel to the hearing nor to confront and cross-examine any adverse witnesses. There is no guarantee of the right to be heard by an impartial tribunal. Moreover, the decision of the three person panel is not appealable, although it may be overruled by the unilateral decision of the Commissioner. *See id.* at 47. ACR regulations do not require that the panel's decision be reported in writing or otherwise explained to the foster parent.[6]

C. *Federal Court Action*

Mrs. Rivera commenced a civil rights action under 42 U.S.C. § 1983 (1976) after receiving the hearing panel's decision. She charged that the procedures used by the State of Connecticut in foster care termination hearings violated her due process rights under the Fourteenth Amendment to the United States Constitution. A three judge panel was convened to consider this constitutional challenge to state procedures. 28 U.S.C. § 2281 (repealed 1976), § 2284 (1976). *See King v. Smith,* 392 U.S. 309, 312 n. 3, 88 S.Ct. 2128, 2130 n. 3, 20 L.Ed.2d 1118 (1968). The panel initially abstained from deciding this issue, citing the possibility that the plaintiff may not have exhausted her state court remedies under the Connecticut Uniform Administrative Procedure Act, Conn.Gen.Stat.Ann. § 4–166 *et seq.* (West 1982). The panel retained jurisdiction, but directed plaintiff to file suit in the appropriate state court to resolve the exhaustion issue. *Rivera v. Maloney,* 410 F.Supp. 106, 110–11 (D.Conn.1976). The parties agree that subsequent rulings by the Connecticut state courts in similar cases effectively foreclosed the plaintiff's avenue of appeal through the state system. *See Menard v. Maloney,* No. 120472 (Court of Common Pleas, Fairfield County at Bridgeport, May 4, 1978).

When Mrs. Rivera returned to the federal forum, she decided to limit her request to

---

**6.** Although the ACR Project was touted as a demonstration project, the procedures have been extended each year and presently continue in force in Connecticut. The one exception to this extension is that the foster parent is now permitted to bring legal counsel to these proceedings.

declaratory relief. In light of this procedural amendment, the three judge panel was dissolved and the case was assigned to Judge Zampano. *See* 28 U.S.C. § 2281 (repealed 1976) (three judge panel necessary where petitioner seeks injunctive relief restraining the enforcement, operation or execution of a state statute on grounds of unconstitutionality).

## D. District Court Decision

Mrs. Rivera requested a broad legal ruling when presenting her claims to Judge Zampano. She asked the court to find that long term foster parents provide the same care and familial stability to a foster child that natural parents provide their children.[7] Mrs. Rivera further petitioned the court to rule that, in light of important similarities between long term foster parents and natural parents, foster parents should be guaranteed the same procedural due process protections as natural parents.

Judge Zampano considered these claims and intimated that there may be some instances where long term foster parents should be granted due process protections:

The plaintiff's arguments have considerable force and, in this Court's view, there would appear to be instances in which a liberty interest should be recognized where long-term family relationships evolve out of foster home placements. It seems clear that, as with a biological parent and child, strong, loving, emotional and psychological ties can develop among members of a long-term foster family. Any arbitrary state interference with those ties surely can result in harsh and lasting consequences to the foster child and to the foster family members. In these special circumstances, it would seem that a preremoval hearing which comports with constitutional standards may be required.

*Rivera v. Marcus,* 533 F.Supp. 203 (D.Conn. 1982) (order denying plaintiff's motion to dismiss, motion for class certification, and motion for production of documents), *reprinted in* J.App. at 104. The judge conceded, however, that his constitutional observations were perhaps tenuous in light of the Supreme Court's decision in *Smith v. Organization of the Foster Families for Equality and Reform,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (*Smith v. OFFER*), and three recent appellate decisions where the courts ruled that foster parents do not possess a constitutionally-protected liberty interest in the maintenance of the foster family.[8]

Judge Zampano noted, however, that Mrs. Rivera's case could be distinguished from the prevailing foster removal decisions. The court explained that unlike the typical foster relationship, Mrs. Rivera was biologically related as a half-sister to Esther Jean and Edwin. Moreover, the familial relationship between the plaintiff and the Ross children predated the foster care agreement. Hence, this "extended family" was not created by the state through the foster contract but rather was natural in origin. Finally, Judge Zampano explained that the potential for conflict between the natural and foster parents, typically a serious problem, was not present in this case because the likelihood that the natural parents of the Ross children would petition for custody was remote.[9] After reviewing

---

**7.** Mrs. Rivera had applied for class certification when submitting her claims. Judge Zampano properly denied certification because the grounds upon which Mrs. Rivera prevailed at the district court are not typically present in the case of the usual foster parent. *See* Fed.R. Civ.P. 23(a).

**8.** *See Kyees v. County Department of Public Welfare,* 600 F.2d 693, 695 (7th Cir.1979) (per curiam); *Drummond v. Fulton County Department of Family and Children's Services,* 563 F.2d 1200, 1207 (5th Cir.1977) (en banc), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d

1141 (1978); *Sherrard v. Owens,* 484 F.Supp. 728 (W.D.Mich.1980), *aff'd,* 644 F.2d 542 (6th Cir.) (per curiam), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981).

**9.** Mrs. Ross continues to suffer serious mental problems and is not expected to leave the institution where she has lived for more than ten years. The natural father has never expressed any interest in caring for his children. Whether or not he is meeting his financial obligation for support of his children is not an issue in this appeal.

these unique factors, the court ruled that Dorothy Rivera indeed possessed a liberty interest in the maintenance of her familial relationship with the Ross children.

Judge Zampano then examined the procedures used by the State of Connecticut in foster removal cases to determine if Mrs. Rivera's due process rights were adequately protected. The judge concluded that the state's procedures were constitutionally infirm, and ordered that a new hearing be held with the following procedural safeguards:

(1) Timely and adequate notice of the reasons for termination;

(2) An opportunity to retain counsel;

(3) Upon request, and in the absence of exceptional circumstances, a preremoval hearing;

(4) An opportunity to confront and cross-examine witnesses;

(5) An opportunity to present evidence and arguments;

(6) An impartial decisionmaker; and

(7) A written statement of the decision and a summary of the evidence in support thereof.

*Rivera v. Marcus,* 533 F.Supp. 203 (D.Conn. 1982), *reprinted in* J.App. at 110. Judge Zampano stressed that his ruling was limited to the unique facts of this case and was not addressed to the larger constitutional question concerning the due process rights of the typical foster parent.

On appeal, the State of Connecticut principally contends that the foster contract delineates the rights and obligations of the parties. The state asserts that, even assuming Mrs. Rivera may have possessed some liberty interest in continuing her familial relationship with the Ross children, she relinquished this constitutionally protected interest when she signed the foster care contract. The defendant also contends that even if the court finds a liberty interest in favor of Mrs. Rivera, the procedures at issue here are constitutionally adequate.

*Discussion*

This appeal presents another due process challenge to the procedures used by a state to regulate a particular family activity. Enterprising plaintiffs have endeavored and succeeded in challenging state procedures that do not adequately protect their right to maintain familial relationships, *see Santosky v. Kramer,* 455 U.S. 745, 752, 102 S.Ct. 1388, 1393, 71 L.Ed.2d 599 (1982), to live with their grandchildren, *see Moore v. City of East Cleveland,* 431 U.S. 494, 504–05, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977), and to educate their children, *see Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). The courts have often noted in these cases that due process is necessarily an imprecise concept:

Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint.

. . . [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press,

and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.

*Moore v. City of East Cleveland*, 431 U.S. 494, 501–02, 97 S.Ct. 1932, 1936–1937, 52 L.Ed.2d 531 (1977) (footnote omitted) (quoting *Poe v. Ullman*, 367 U.S. 497, 543, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, *J.*, dissenting)). The courts have consistently agreed, however, that an individual is not entitled to constitutional protection under the Due Process Clause unless that party can demonstrate that: (a) there has been a deprivation of liberty or property in the constitutional sense; and (b) the procedures used by the state to effect this deprivation were constitutionally inadequate. *Smith v. OFFER*, 431 U.S. at 847, 97 S.Ct. at 2111; *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974).

**A.** *Liberty Interest in Favor of a Custodial Relative*

█ The Supreme Court has frequently reaffirmed that " 'freedom of personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.' *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–40 [94 S.Ct. 791, 796, 39 L.Ed.2d 52] (1974)." *Smith v. OFFER*, 431

U.S. at 842, 97 S.Ct. at 2108. While this principle is largely undisputed,[10] there is some disagreement over what precisely constitutes a "family" for purposes of due process. The parent-child relationship, whether natural or formalized through adoption, properly forms the core of the constitutional notion of "family." The courts have extended procedural due process protection to this relationship. *See Smith v. OFFER*, 431 U.S. at 842 & n. 47, 97 S.Ct. at 2108 & n. 47; *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *May v. Anderson*, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). The constitutional conception of "family" has evolved, however, to include relationships among members of what has commonly become known as the "extended family." *See Moore v. City of East Cleveland*, 431 U.S. at 496–506, 97 S.Ct. at 1934–1939 (a grandmother and her two grandsons); *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (an aunt and legal guardian of her niece). The courts have focused principally on the biological relationship between the parties when extending due process protection to persons not specifically fitting the parent-child mold. *Compare Moore v. City of East Cleveland*, 431 U.S. at 498–99, 97 S.Ct. at 1934–1935; *with Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974).

In *Moore*, the City of East Cleveland adopted a land use regulation that prohibited a grandmother from living with two grandsons from different lineal branches of her family.[11] The city defended this ordi-

---

**10.** There is less than uniform consensus concerning the question whether the family *qua* family should be entitled to far-reaching substantive due process protection. *See Moore v. City of East Cleveland*, 431 U.S. at 536–40, 97 S.Ct. at 1954–1956 (Stewart, J., dissenting), 549, 97 S.Ct. at 1961 (White, J., dissenting).

**11.** The Housing Code for the City of East Cleveland, Ohio, limited occupancy of a dwelling unit to members of a single "family." § 1351.02. This Housing Code contained a peculiar definitional section, however, and recog-

nized as a "family" only a select few categories of related individuals:

Section 1341.08 (1966) provides:

"Family" means a number of individuals related to the nominal head of the household or to the spouse of the nominal head of the household living as a single housekeeping unit in a single dwelling unit, but limited to the following:

(a) Husband or wife of the nominal head of the household.

(b) Unmarried children of the nominal head of the household or of the spouse of the

nance by arguing that restrictive limitations on occupancy of city dwellings were necessary to prevent overcrowding, minimize traffic and parking congestion, and to alleviate the financial burdens on East Cleveland's school system. The city also asserted that the Due Process Clause was not designed to protect the interests asserted by Mrs. Moore. Counsel for East Cleveland contended that the notion of "family" should be limited, for purposes of due process, to the nuclear family and should not be extended to include relationships such as the one presented by Mrs. Moore and her grandchildren.

The Supreme Court summarily and convincingly rejected this restrictive conception of "family:"

> Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition. Over the years millions of our citizens have grown up in just such an environment, and most, surely, have profited from it. Even if conditions of modern society have brought about a decline in extended family households, they have not erased the accumulated wisdom of civilization, gained over the centuries and honored throughout our history, that supports a larger conception of the family. Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home. Decisions concerning child rearing, which *Yoder, Meyer, Pierce* and other cases have recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household—indeed who may take on major responsibility for the rearing of the children. Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life. This is apparently what happened here.

431 U.S. at 504–05, 97 S.Ct. at 1938 (footnotes omitted).

The State of Connecticut concedes that biological relationships are important under due process analysis. The state argues, however, that the Court should view Mrs. Rivera's status in this action *not* as a half-sister to the Ross children, but rather as a foster parent whose rights were carefully circumscribed by the foster care agreement. The appellant urges us to adopt the view of the three federal courts that have denied to foster parents a constitutionally cognizable interest in the maintenance of the foster relationship. See *Kyees v. County Department of Public Welfare,* 600 F.2d 693, 695 (7th Cir.1979) (per curiam); *Drummond v. Fulton County Department of Family and Children's Services,* 563 F.2d 1200, 1207 (5th Cir.1977) (en banc), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978); *Sherrard v. Owens,* 484 F.Supp. 728 (W.D. Mich.1980), *aff'd,* 644 F.2d 542 (6th Cir.) (per curiam), *cert. denied,* 454 U.S. 823, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). Each of these cases was decided in the wake of, and

nominal head of the household, provided, however, that such unmarried children have no children residing with them.

(c) Father or mother of the nominal head of the household or of the spouse of the nominal head of the household.

(d) Notwithstanding the provisions of subsection (b) hereof, a family may include not more than one dependent married or unmarried child of the nominal head of the household or of the spouse of the nominal head of the household and the spouse and dependent children of such dependent child. For the purpose of this subsection, a dependent person is one who has more than fifty percent of his total support furnished for him by the nominal head of the household and the spouse of the nominal head of the household.

(e) A family may consist of one individual. *Moore v. City of East Cleveland,* 431 U.S. at 496 n. 2, 97 S.Ct. at 1934 n. 2 (setting forth text of statute). Mrs. Moore did not fall within any of these categories because two grandsons from different lines of her family were living in the Moore family home.

relied principally on, the Supreme Court's decision in *Smith v. OFFER,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).

In *OFFER,* the plaintiff class was comprised of long term foster parents residing in New York. They argued that when a child has lived in a foster home for one year or more, important psychological and familial ties are created between the foster parent and child. The plaintiff class cited this natural progression in the foster relationship and urged the Court to recognize that foster parents possess a liberty interest in the survival of the long term foster family sufficient to invoke the protections of the Due Process Clause. *Id.* at 839, 97 S.Ct. at 2106.

The *OFFER* Court carefully considered this argument and suggested in dicta that long term foster parents may be entitled to some due process protection in light of the relationships developed through mutual care and support:

> No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship. At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family.

*Id.* at 844, 97 S.Ct. at 2109 (footnote omitted). The Court identified, however, three important differences between the typical foster family and the natural family. First, there is generally no biological relationship between foster parents and the children in their care. Moreover, while the natural family has its origins separate and apart from state law, the source of the foster family relationship is contractual in nature and is carefully circumscribed by the state in the foster care agreement. Finally, there is a virtually unavoidable tension between protecting the liberty interests of the natural parents while also extending familial rights in favor of foster parents.

The Court reviewed these factors and noted that the claims of the plaintiff class raised "complex and novel" questions of constitutional law. *Id.* at 847, 97 S.Ct. at 2111. The Court explained, however, that it was unnecessary to resolve these issues because even if it were to assume that foster parents have a protected liberty interest, the procedures adopted by the State of New York were constitutionally adequate. *Id.* Courts in the wake of *OFFER* have relied on the three distinguishing factors cited in that decision to support their ruling that foster parents do not possess a constitutionally protected liberty interest in the maintenance of the foster family relationship. *See Kyees v. County Department of Public Welfare,* 600 F.2d 693, 695 (7th Cir.1979) (per curiam); *Drummond v. Fulton County Department of Family and Children's Services,* 563 F.2d 1200, 1207 (5th Cir.1977) (en banc), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1141 (1978); *Sherrard v. Owens,* 484 F.Supp. 728 (W.D. Mich.1980), *aff'd,* 644 F.2d 542 (6th Cir.) (per curiam), *cert. denied,* 454 U.S. 823, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981).

█ This action is quite different, however, from the typical foster removal case. None of the factors weighing against the finding of a liberty interest in favor of foster parents is present in this case. Mrs. Rivera is related biologically to the Ross children. They lived together as a family for several years *before* the foster care agreement was consummated. Finally, there is not the potential for conflict with the rights of the natural parents of the Ross children. The natural father has shown no interest in the children in more than twelve years. Mrs. Ross expressly asked Mrs. Rivera to care for her children and, in light of Mrs. Ross' deteriorating mental condition, there is very little likelihood that she will ever leave the institution she entered in 1972.

In these circumstances, we find that Mrs. Rivera possesses an important liberty interest in preserving the integrity and stability

of her family.[12] We believe that custodial relatives like Mrs. Rivera are entitled to due process protections when the state decides to remove a dependent relative from the family environment. Indeed, we find no legally principled distinction between Mrs. Moore's rights in East Cleveland and Mrs. Rivera's in Hartford. Although separated by several hundred miles, both women carried on the laudable American tradition of providing food, shelter and comfort for members of their respective extended families in times of adversity. Justice Powell's observations in *Moore v. City of East Cleveland* bear repeating:

> Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition. . . .

> Whether or not such a household is established because of personal tragedy, the choice of relatives in this degree of kinship to live together may not lightly be denied by the State.

431 U.S. at 504–06, 97 S.Ct. at 1938–1939 (footnote omitted).

Our ruling today is not in conflict with those recent decisions that reject the due process claims of foster parents. In *Kyees v. County Department of Public Welfare,* the court prefaced its holding by explaining that:

> It has long been clear that there exists a "private realm of family life which the state cannot enter." *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). But it has not always been clear what constitutes a "family." *Certainly, where a biological relationship exists, the power of the state to regulate activity is limited. See e.g., Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct.

1208, 31 L.Ed.2d 551 (1972); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Drollinger v. Milligan,* 522 [552] F.2d 1220 (7th Cir.1977).

600 F.2d 693, 697 (7th Cir.1979) (per curiam) (emphasis added).

In *Sherrard v. Owens,* the court observed that imposing general guidelines to regulate all foster family relationships "would not only be unwise, but foolhardy" given the unique qualities characterizing each relationship. 484 F.Supp. 728, 739 (W.D.Mich. 1980), aff'd, 644 F.2d 542 (6th Cir.) (per curiam), cert. denied, 454 U.S. 823, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981). The court suggested that several factors be considered when assessing the liberty interests of a foster parent, including: (1) the biological relationship between the parties; (2) the expectation of the parties at the time the relationship was commenced; and (3) the age and previous living experience of the children prior to entering the foster care environment. *Id.* at 739–40.

Each of these factors weighs strongly in favor of extending due process protection to Mrs. Rivera. As noted earlier in this opinion, Mrs. Rivera is the half-sister of the Ross children. She cared for the Ross children almost from birth and continued to function as their "surrogate mother" after Mrs. Ross was institutionalized. She assumed responsibility for Esther Jean and Edwin well before the foster care agreement was consummated. *See Drummond v. Fulton County Department of Family and Children's Services,* 563 F.2d 1200, 1207 (5th Cir.1977) (en banc) ("True liberty rights do not flow from state laws, which can be repealed by action of the legislature. Unlike property rights they have a more stable source in our notions of intrinsic human rights.") (court rejects claims of foster parents because their kindred relationship did not arise through natural family ties but rather was created by state law).

12. The years which have passed since the Ross children were removed from the Rivera home will militate against their removal from the home of the present foster parents at any future hearing. This consideration, however, does not diminish Mrs. Rivera's liberty interest. She has not been responsible for this long delay and is entitled to due process of law.

The liberty interests at stake in this action are rendered more compelling given the important interests that the Ross children maintain in preserving the integrity and stability of their extended family. The courts have long recognized that children possess certain liberty rights and are entitled to due process protection of these rights. *See Parham v. J.R.,* 442 U.S. 584, 596–97, 99 S.Ct. 2493, 2501, 61 L.Ed.2d 101 (1979) (child has a protected liberty interest in being free from arbitrary confinement in a state mental hospital); *see also Santosky v. Kramer,* 455 U.S. 745, 754 n. 7, 102 S.Ct. 1388, 1393 n. 7, 71 L.Ed.2d 599 (1982) ("The fact that important liberty interests of the child and its foster parents may also be affected by a permanent neglect proceeding does not justify denying the *natural parents* constitutionally adequate procedures."). The Ross children surely possess a liberty interest in maintaining, free from arbitrary state interference, the family environment that they have known since birth. The children lived with their half-sister for more than five years before the state intervened and, without seeking their opinion or assent, removed them from the Rivera home. If the liberty interest of children is to be firmly recognized in the law, we must ensure that due process is afforded in situations like that presented here where the state seeks to terminate a child's long-standing familial relationship.

█ The state asserts that Mrs. Rivera waived any constitutional rights that she may have possessed when she voluntarily assented to the foster contract. The state highlights the written agreement, especially the provision which authorizes it to remove children from the foster home at any time. *See* Connecticut foster care agreement between the State Welfare Department and Dorothy Rivera for the care of Esther Jean and Edwin Ross, at ¶ 8 (Jan. 14, 1972), *reprinted in* J. App. at 52–53. This argument, however, ignores a fundamental principle of constitutional law:

It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence in the loss of fundamental rights." A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (footnotes omitted). There is no evidence in the record to even remotely suggest that Mrs. Rivera intentionally and intelligently waived her due process rights when she signed the foster care agreement. Nowhere does the state argue that it apprised Mrs. Rivera of the legal implications of her decision, or that she was even aware that the proceedings for removal from a foster home differed from the Juvenile Court proceedings to remove custody from natural parents. Accordingly, we reject this waiver argument.

**B.** *Quantum of Process Due*

The finding of a liberty interest in favor of the moving party is a beginning, not a conclusion, to our due process inquiry. Once a liberty interest is recognized, the focal question becomes whether the procedures used by the state adequately protect the interest implicated by the petitioner's claim. *See Mathews v. Eldridge,* 424 U.S. 319, 332–33, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). The quantum of process constitutionally required in any given dispute is, however, not subject to specific measurement:

For all its consequence, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230]. Rather, the phrase

expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

*Lassiter v. Department of Social Services,* 452 U.S. 18, 24, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981).

The courts do agree, though, that due process fundamentally requires that the aggrieved party be provided with an opportunity to be heard "'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)); *see Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). The "meaningfulness" of the process must be considered in the context of three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903; *see Lassiter v. Department of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981).

### 1. *Private Interest*

The private interest at stake in this litigation is substantial. Mrs. Rivera and the Ross children seek protection from state action which threatens the integrity and stability of their familial relationship. This important interest has consistently been recognized and afforded far-reaching due process protection. *See Prince v. Massa-*

*chusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (recognizing that there is a "private realm of family life which the state cannot enter"); *see also Wisconsin v. Yoder,* 406 U.S. 205, 231–33, 92 S.Ct. 1526, 1541–1542, 32 L.Ed.2d 15 (1972) (finding that Amish parents, consistent with religious beliefs and general notions of family privacy, are entitled to substantive due process protection when removing their children from public school after the eighth grade).

### 2. *Risk of Erroneous Deprivation*

The risk of an erroneous constitutional deprivation turns largely on the fairness and reliability of the existing pretermination procedures. As noted earlier, *see supra* at 1019, the procedures used by the State of Connecticut in foster removal cases are quite limited. The foster parent is not permitted to bring legal counsel to the removal hearing. Nor is that person allowed to confront or cross-examine adverse witnesses. Indeed, the foster parent is removed from the hearing room after testifying. Moreover, the hearing tribunal is comprised of three people—two Department employees and one social worker from a private agency that often relies on the state for its business—who arguably have vested interests in deferring to the opinions of the Commissioner. Finally, the hearing panel is not required to render a written explanation of its decision and no appeal may be taken from that ruling.

These procedures create a potential for erroneous deprivation *even* when administered by sincere and well intentioned state employees. The aggrieved foster parent in most cases cannot explain or defend the charges of unfitness asserted against her because state regulations do not require that she be apprised of these allegations. It is entirely possible under these procedures that the hearing tribunal may rely on evidence that the foster parent, if given the opportunity, could either refute or explain. Moreover, since the foster removal decision is not required to be explained in writing, the foster parent may never know whether

the hearing panel mistakenly relied on erroneous information. Finally, since the panel's decision is not appealable, the aggrieved foster parent cannot challenge this decision, even if arguably wrong, in another forum. The appellate process recognizes that there exists an inherent risk of error, even when cases are decided by enlightened jurists. State procedures that do not provide for some type of appellate mechanism must necessarily be subject to close scrutiny.

### 3. *State Burden*

The additional procedures ordered by Judge Zampano do not impose substantial administrative and financial burdens on the state. The state would be required only to enlist the services of one disinterested person to serve as the hearing officer. That person would be expected to prepare a written opinion based upon his observations at the termination proceeding and his general expertise in familial care. Judge Zampano, in an earlier opinion, ordered the state to implement procedures similar to those required here in situations where foster parents contest the reduction or termination of foster care benefits. *See Sockwell v. Maloney,* 431 F.Supp. 1006, 1012–13 (D.Conn. 1976), *aff'd,* 554 F.2d 1236 (2d Cir.1977) (per curiam). These procedures have been used in foster benefit proceedings for several years and the state has not produced any evidence to show that they have been financially or administratively onerous. Moreover, since these procedures are already in place, we expect that procedural revision could be accomplished without effecting a major overhaul of the existing system.

The state argues that the foster removal procedures were constitutionally adequate and cites the Supreme Court's decision in *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), to support its position. In *Parham,* the Court found that informal procedures did not offend the due process rights of a minor in a proceeding leading to the confinement of that child in a state mental institution. *Id.* at 614–15, 99 S.Ct. at 2510. There are, however, important differences that distinguish *Parham*

from the present dispute. There, the parents concurred in the decision to confine their child. Formal procedures posed a substantial threat to the autonomy and integrity of the parent-child relationship. *Id.* at 610, 99 S.Ct. at 2508. Moreover, the parents fully expected that their child's confinement would be temporary because the program was designed to encourage parents to cooperate with state health officials in a joint effort to cure the child of his mental affliction. Thus, since the proceeding was non-adversarial, temporary, and respected the right of the parents to make difficult decisions concerning the well being of their child, the *Parham* Court found that due process could be satisfied through informal procedures.

This present controversy is distinguishable from *Parham.* The foster removal process is necessarily adversarial when the foster parent objects to the notice of removal, as Mrs. Rivera does here. The decision of the hearing panel permanently deprives the custodial relative of the care and kinship with her "surrogate children." Finally, there is no potential for conflict with the rights or interests of the natural parents in this litigation.

■ We agree with the district court that the *Mathews v. Eldridge* balance tips decidedly in favor of extending substantial due process protection to Mrs. Rivera. Judge Zampano ruled that due process required that Mrs. Rivera be provided with the following procedural safeguards:

(1) Timely and adequate notice of the reasons for termination;

(2) An opportunity to retain counsel;

(3) Upon request, and in the absence of exceptional circumstances, a preremoval hearing;

(4) An opportunity to confront and cross-examine witnesses;

(5) An opportunity to present evidence and arguments;

(6) An impartial decisionmaker; and

(7) A written statement of the decision and a summary of the evidence in support thereof.

*Rivera v. Marcus,* 533 F.Supp. 203 (D.Conn. 1982) (order denying plaintiff's motion to dismiss, motion for class certification, and motion for production of documents), *reprinted in* J. App. at 110. "Appellate tribunals have accorded district courts broad discretion to frame equitable remedies so long as the relief granted is commensurate with the scope of the constitutional infraction." *Todaro v. Ward,* 565 F.2d 48, 54 n. 7 (2d Cir.1977) (citations omitted). We believe that the procedures imposed by the district court are fully "commensurate with the scope of the constitutional infraction."[13] *Id.* We leave for another day the question of the constitutionality of the ACR procedures applied to foster parents as such.

Our holding today should not be understood to cast aspersions on the foster parent program in the State of Connecticut or to intimate that state employees harbor sinister motives when considering foster removal cases. We note, however, that the most benign motives and well-intentioned acts do not overcome the absence of adequate due process protection:

> The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

*Stanley v. Illinois,* 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972) (footnote omitted); *see Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 648, 94 S.Ct. 791, 800, 39 L.Ed.2d 52 (1974); *In Re Gault,* 387 U.S. 1, 18, 87 S.Ct. 1428, 1438, 18 L.Ed.2d 527 (1967) ("unbridled discretion, however benevolently motivated, is fre-

quently a poor substitute for principle and procedure").

The decision of the district court is affirmed.

IRVING R. KAUFMAN, Circuit Judge (concurring):

I concur fully in Judge Meskill's thorough opinion. It is beyond peradventure that the nuclear family is not the only constitutionally protected family unit. With the increasing pressures of modern society and changing social mores, it has become a commonplace to encounter families whose members include stepparents, half-brothers and -sisters, aunts and uncles and others. Although these groups may not fit the conventional mold, they provide the same important social and educational functions. Moreover, the emotional ties which bind such families are no less significant or deep than those which exist within the traditional nuclear structure. I write separately, not to disagree with any of the issues addressed in the majority opinion, but to emphasize that the constitutional rights of children are directly and vitally implicated in custody termination proceedings.

Children, of course, are not afforded the same rights as adults. Courts have recognized and in general deferred to the exercise of parental authority over children. *See, e.g., Prince v. Massachusetts,* 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944); *Moe v. Dinkins,* 669 F.2d 67 (2d Cir.1982) (per curiam); *see also* Kaufman, *Protecting the Rights of Minors: On Juvenile Autonomy and the Limits of the Law,* 52 N.Y.U.L.Rev. 1015 (1977). The state, on occasion, may also assert its power as *parens patriae.* At the same time it is clear that the Constitution does secure certain basic rights for children. Juvenile courts, for example, are required to provide their charges with full notice of the allegations against them, must allow confrontation and cross-examination of adverse witnesses, and guarantee the right to remain silent. *See In Re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18

---

**13.** We do not, of course, limit by this opinion the police power of the state to remove a child *from a foster home prior to a hearing in cases of serious neglect, abuse or other emergency.*

L.Ed.2d 527 (1967). In addition, the juvenile's guilt must be proved beyond a reasonable doubt. *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

The most vexatious problems arise when the concerns of state, parent and child conflict, as in the present case. Connecticut asserts that the best interests of the Ross children were served when they were removed from Ms. Rivera's care. Rivera responds she had a right to continued custody, and should have been afforded additional due process protections. The appointed representatives of the minor children argue that the children should not have been taken from Rivera's custody without more indepth consideration of their interest in a long-term stable living environment.

This court has previously observed that the "reciprocal rights of both parent and children" are affected when the state seeks to intervene in a family and assume custody over minor children. *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977); *see also Santosky v. Kramer,* 455 U.S. 745, 760, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599 (1982). Juveniles clearly have an interest in steady, continuing relationships with their parents or custodial relatives, and absent evidence of abuse or neglect, the state ordinarily should not intervene in the "private realm of family life." *Prince v. Massachusetts, supra,* 321 U.S. at 166, 64 S.Ct. at 442. Moreover, where there is no indication of abuse, parents can best assert not only their own rights, but also those of their children, because both share a concern with maintaining the integrity of the family unit. "[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky v. Kramer, supra,* 102 S.Ct. at 1398 (footnote omitted).

Children are among the most defenseless members of our society and rely upon others for their subsistence and upbringing. They are not, however, wholly without rights. *See generally* Institute of Judicial Administration—American Bar Association Joint Commission on Juvenile Justice Standards, Standards Relating to the Rights of Minors (1981). When the state seeks to remove juveniles from the protection and care of their parents, either biological or, as in the present case, de facto, it must assure that the best interests of the children remain the foremost and everpresent consideration. Connecticut's failure to allow Ms. Rivera to fully and fairly participate in the Administrative Case Review hearing, prevented her from asserting her concern, and that of the Ross children, that their extended family relationship would not be abruptly severed by the awesome power of the state.