SPENCER, Leona, mother, Spencer, Darrell, son, Forney, Katrina, daughter, Petchenik, Steven, parent sub, Plaintiffs,

v.

LAVOIE, Kathryne, caseworker, Comfort, Hugh and Mary, foster parents, Dowd, Kevin, Judge, Family Court, Kimiecik, Stanley J., Comm. Chenango County Social Services, Prinzo, Ross, Comm. New York State Dept. of Social Services, Defendants.

No. 95–CV–1331.

United States District Court,
N.D. New York.

Dec. 1, 1997.

Peter A. Orville, P.C., Patrick J. Kilker, of counsel, Vestal, NY, for Plaintiffs.

Sugarman, Wallace, Manheim & Schoenwald, Mary Keib Smith, of counsel, Syracuse, NY, for Defendants Kathryne Lavoie and Stanley J. Kimiecik.

Chernin & Gold, Margaret J. Fowler, of counsel, Binghamton, NY, for Defendants Hugh and Mary Comfort.

**MEMORANDUM, DECISION & ORDER**

McAVOY, Chief Judge.

In this civil rights action filed pursuant to 42 U.S.C. § 1983, defendants Kathryne Lavoie and Stanley J. Kimiecik move for summary judgment based on qualified immunity. Defendants Hugh and Mary Comfort move for summary judgment based upon lack of supplemental jurisdiction.

## I. BACKGROUND

### A. Facts:

Plaintiffs Darrell Spencer ("Darrell"), born March 4, 1983, and Katrina Forney ("Katrina"), born July 1, 1981, are the children of plaintiff Leona Spencer ("Leona"). At all relevant times, plaintiff Steven Petchenik was Leona's boyfriend, with whom she, Darrell and Katrina resided. Petchenik was not the adoptive father of either Darrell or Katrina.

On November 18, 1992 Petchenik's daughter from a prior marriage, Marsha Sue Lanfair, made an oral complaint to the Chenango County Department of Social Services ("DSS") regarding abuse and/or neglect of Darrell and Katrina by Leona and Petchenik, including allegations of excessive corporal punishment, sexual abuse, and inadequate guardianship. The same day, Lavoie was assigned as the caseworker to investigate the complaint. Lavoie's first move was to review any prior reports or files concerning the individuals involved, both to obtain background information and to assess any risks to the children.[1] Lavoie then spoke to her supervisor, Denise Bodie, who told her to contact Lanfair and set up a meeting between Lavoie, Lanfair and the state police to get a written statement.

Lavoie interviewed Lanfair on November 19. The next day, Lanfair gave a statement to the New York State Police. In that statement, Lanfair made the following allegations:

1) that Leona and Petchenik told her Darrell slept in a cot outside the house when he wet his bed;

---

1. The record is unclear as to what, if any, information was revealed by the background check.

2) that she had seen Petchenik push Darrell to the ground on one occasion;

3) that she had seen Leona strike Darrell five to eight times in the head on one occasion;

4) that she had witnessed Leona and Petchenik use a form of discipline referred to as "assume the position," in which the children were forced to stand on their toes facing the wall; on one such occasion, Darrell fell asleep, at which point Leona struck him with a ping-pong paddle;

5) that she had witnessed both children get slapped in the head by Leona and Petchenik;

6) that as a form of discipline, Darrell had been forced to keep hot pepper in his mouth for five minutes;

7) that she had heard Petchenik address the children as "fucking assholes" or "fucking animals."

Lanfair's statement also recounted a number of instances in which Leona or Petchenik made sexually-oriented remarks to the children or in their presence. In one instance, Petchenik allegedly told Darrell that if he did not put on his pajamas, Petchenik would "fuck him in the ass." On several occasions, the conduct revolved around Petchenik, Leona and another woman, Sharon Simmons, whom Lanfair alleged was the "live-in lover" of both Leona and Petchenik. Leona allegedly told Lanfair, while the children were in earshot, "that if "[Petchenik]" wanted to have sex with Sharon or if Sharon wanted to have sex with [Petchenik], that Sharon had to have sex with [Leona] first." On another occasion, the children allegedly witnessed Leona and Sharon "kissing on the mouth" and "fooling around."

In addition to these instances revolving around the children, Lanfair recounted her own alleged history of abuse at the hands of Petchenik. That history included instances in which Petchenik, among other things, slapped her, put a gun to her head, and hit her on the buttocks with a belt until she bled.

The statement also alleged that in September of 1992, Darrell allegedly sodomized Lanfair's son. In fact, one of the reasons Lanfair came forward, she said in her statement, was that "Darrell had to learn somewhere what he did to [her] son. He either had it done to him or he saw other people doing it."

Lavoie contacted the children's school on November 21 to make sure they were present and to have someone check on their condition. She spoke with a school counselor, who informed her that the children were in school and appeared normal.

Lavoie didn't receive Lanfair's written statement from the state police until November 23. The next day, she interviewed Katrina and Darrell at their school. She first interviewed Darrell, who told her of an instance in which he thought Petchenik was going to shoot him, that Petchenik "bit a dog," and that his sister had gotten in trouble for talking about "assume the position" with a friend, and thus he was afraid to discuss it. He also indicated that Petchenik used a belt and red pepper. As to the alleged abuse Darrell had inflicted on Lanfair's son, Darrell told Lavoie that other relatives, not Petchenik, had taught him to do that. He also added that he slept on the cot, but added that the family sometimes camped out. At that point, Lavoie alleges that Darrell began talking about "odd things." To Lavoie, Darrell appeared scared, but showed no physical signs of abuse. Later that day, Darrell gave a statement to the New York State Police iterating what he told Lavoie. Lavoie then spoke to Katrina, who confirmed that "assume the position" was used in the household, but said that things were otherwise fine.

Later that day, Lavoie communicated her findings to Bodie, who then forwarded the information about the Lanfair statement and the interviews with the children to the County Attorney. The County Attorney then took the information to Family Court Judge Kevin Dowd, who issued a temporary order of removal that read, in pertinent part, as follows:

The Chenango County Department of Social Services, having applied to this Court and having alleged that there exists reasonable cause to believe the children's interests require immediate protection pending a full hearing before this Court; and having presented information including a

statement of Marsha Sue Lanfair ... forming the basis of such belief to this Court; and the parents of said children having not been present because the Court finds that past history of threats makes notice of this hearing to report inappropriate; and there being insufficient time to hold a preliminary hearing pursuant to Section 1027;

And it appearing the children's interests do require protection pending a hearing and

It further appearing that imminent risk to the child would not be eliminated by the issuance of an order of protection directing the removal of [Leona and Petchenik] from the children's residence, it is

ORDERED that the said children be temporarily removed from the place where said children are residing ...

Def. Ex. I. Pursuant to that order, Lavoie removed the children from school that day and, after taking them to the state police barracks where they gave statements placed them in a foster home with the Comforts. No efforts were made to contact Leona or Petchenik at any time before the children were removed; notice of the removal, however, was left at the household after the children left, and an affidavit of service was sent to Leona on November 25.

On February 2, 1993, Judge Dowd held a hearing at which Leona and Petchenik were present and represented by counsel. At the hearing, the two admitted that they had put hot pepper in Darrell's mouth on one occasion, based upon which Judge Dowd made a finding of neglect. He directed that Leona find suitable housing for herself and the children and that they live apart from Petchenik. Leona and Petchenik also were ordered to be evaluated by a mental health clinic, and Leona was directed to take parenting classes.

## B. Procedural History:

Plaintiffs filed their Complaint on September 18, 1995. After several amendments (including one dropping defendant Prinzo and adding defendant, Brian Wing) and a motion to dismiss filed by defendants, this Court, on February 26, 1996 in a decision from the bench, dismissed the action against Dowd and denied all other motions. In doing so, the Court found that plaintiffs' inartfully structured Third Amended Complaint nonetheless stated a claim for deprivation of federally protected rights under 42 U.S.C. § 1983. The action later was discontinued against Wing by stipulation of the parties. The only remaining defendants are Lavoie, Kimiecik and the Comforts. They now move for summary judgment.

## II. DISCUSSION

### A. Defendants' Motions for Summary Judgment.

The Court now turns to defendants' motions for summary judgment.

### 1. The Standard for Summary Judgment

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party, *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir.1975), and the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985).

Once the moving party has met its burden, the non-moving party must come forward with *specific facts* showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. at 1355–56. A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci*, 923

F.2d 979, 982 (2d Cir.1991). The motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & H.R. Co. v. Conrail,* 902 F.2d 174, 178 (2d Cir.1990)(quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56).

It is with these considerations in mind that the Court addresses defendants' motions for summary judgment.

## 2. Defendants Lavoie and Kimiecik

■ The Court first notes that Lavoie and Kimiecik argue that the action should be dismissed against the County of Chenango as well. The Court can discern nothing in the Third Amended Complaint that could be construed as an allegation against either Chenango County itself or the Chenango County Department of Social Services. To prevail on such a claim, plaintiffs would of course be required to plead and prove that the alleged constitutional torts in question were committed pursuant to an official government policy of some sort. *See Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Plaintiffs have neither pleaded such facts nor set forth any evidence of any custom or policy of Chenango County. Thus, to the extent plaintiffs intended to state such a claim, it must be dismissed. *See Reynolds v. Strunk,* 688 F.Supp. 950, 959 (S.D.N.Y.1988).

Next, defendants' Lavoie and Kimiecik move for summary judgment, dismissing the Complaint in its entirety, based upon the doctrine of qualified immunity.

■ Section 1983 provides a remedy for the deprivation of federally protected rights under color of state law. *See Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, "[q]ualified immunity insulates public officials from claims for damages where their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Defore v. Premore,* 86 F.3d 48, 50 (2d Cir.1996) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Three factors are utilized by courts in this circuit to determine whether a right was clearly established: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). Qualified immunity also will protect a defendant, even where the right was clearly established, if the undisputed facts show that it was objectively reasonable for the defendant to believe the acts did not violate that right. *See Defore,* 86 F.3d at 50; *Benitez v. Wolff,* 985 F.2d 662 (2d Cir. 1993).

■ There is no doubt that at the time the children were removed from their home, "it was clearly established that a parent's interest in the custody of his or her children was a constitutionally protected 'liberty' of which he or she could not be deprived without due process, which would generally require a predeprivation hearing." *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (citing *Stanley v. Illinois,* 405 U.S. 645, 649–58, 92 S.Ct. 1208, 1211–16, 31 L.Ed.2d 551 (1972)). The court in *Robison,* however, recognized an equally well-established principle: namely, that the appropriate government officials may effect a temporary deprivation of custody, without parental consent or a court order, when presented with "emergency" circumstances. *Robison,* 821 F.2d at 921.

■ Plaintiffs argue that Lavoie and Kimiecik's actions could not have been objectively reasonable because they failed to comply with the requirements of New York Family Court Act § 1022, which provides, *inter alia,* that an applicant for temporary removal must seek the parent's consent and provide the parent with notice. This approach, however, misconceives the inquiry in a § 1983 action. The question presented by plaintiffs' § 1983 claim is not whether Lavoie or Kimiecik violated state law, but whether

they violated plaintiffs' federal constitutional or statutory rights. *See Doe v. Connecticut Dep't of Child and Youth Servs.*, 911 F.2d 868, 869 (2d Cir.1990). Thus, if it was objectively reasonable for Lavoie or Kimiecik to believe that emergency circumstances were present, they will be entitled to summary judgment based upon qualified immunity regardless of whether their actions comported with state law. *Id.; see Robison*, 821 F.2d at 921.

This case presents the Court, with the difficult dilemma recognized by the Second Circuit in *van Emrik v. Chemung County Dept. of Soc. Services*, 911 F.2d 863 (1990). "If [caseworkers] err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights." *Id.* at 866. In this case, Lavoie was confronted with Lanfair's statement and the interviews with Darrell and Katrina. Lanfair's statement contained allegations that, if true, would constitute a pattern of serious abuse and neglect. Moreover, though Darrell and Katrina did not substantiate many of those allegations, Darrell indicated that he was "afraid" to discuss "assume the position," and was ambivalent at best about some of the other allegations. Lavoie thus passed this information on to her supervisor, who in turn communicated with the County Attorney.

An "emergency" in this context is defined by the Second Circuit as follows: "the child is immediately threatened with harm ... for example ... where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir.1991); *see Tenenbaum v. Williams*, 862 F.Supp. 962 (E.D.N.Y.1994). Based on the information Lavoie had, it was reasonable for her to believe that such an emergency existed.[2] Lanfair's allegations presented Lavoie with a scenario giving her reason to believe Darrell and Katrina were subject to ongoing emotional and physical abuse and neglect; there

was no reason for Lavoie to believe that absent removal, such conduct would not continue. And though the allegations in part were uncorroborated by the children, the Court sees nothing unreasonable about Lavoie's reliance on Lanfair's statement, nor can we find any requirement in the case law that a child protective worker verify the credibility or veracity of a source with the kind of scrutiny reserved for criminal cases. *See, e.g., Tenenbaum*, 862 F.Supp. at 971 (rejecting notion that no emergency can exist where caseworkers "possess only uncorroborated information from an informant of untested reliability") (internal quotations omitted). Moreover, some of the allegations were corroborated by Darrell, including the incident with the red pepper (which Leona and Petchenik themselves later admitted), and "assume the position."

Plaintiffs additionally point out that the children showed no physical signs of abuse. Given the nature of Lanfair's allegations, this could not have surprised Lavoie. Child abuse (or neglect) does not always manifest itself in bruises and broken bones. What physical signs could Lavoie have been expected to find, for example, to substantiate Lanfair's allegations regarding the red pepper, "assume the position," and the punishment inflicted on Darrell for wetting his bed? Would it be enough if the children appeared tired, or, as Lavoie herself observed, scared? These are precisely the type of evaluations best left to the judgment of the caseworker. Where that judgment is objectively reasonable, as it was here, qualified immunity will attach.

Finally, when Lavoie removed the children from school on the 24th, she did so not on her own whim, but pursuant to Judge Dowd's order that expressly stated no notice to the parent was required. Based upon all the facts and circumstances with which Lavoie was faced, the Court finds that Lavoie's actions in removing the children were objectively reasonable, and "no rational jury could

---

2. Because it was Judge Dowd who issued the order of removal, apparently at the behest of the County Attorney, it is not at all clear that any action taken by Lavoie proximately caused the deprivation in question. To the extent this presents an ambiguity, the Court will construe it in plaintiffs' favor and assume proximate cause.

find that [they were] not." *van Emrik*, 911 F.2d at 866.

■ To this point, the Court has confined its discussion to the actions of defendant Lavoie, who clearly is entitled to qualified immunity for her actions. As to defendant Kimiecik, the only allegation in the Third Amended Complaint is that he failed to remedy a wrong after learning of it. Plaintiffs provide no evidence whatsoever of Kimiecik's personal involvement. Therefore, his motion for summary judgment will be granted in its entirety. *See Dietz v. Damas*, 932 F.Supp. 431, 459 (E.D.N.Y.1996).

### 3. Defendants Hugh and Mary Comfort

Since summary judgment has been granted as to all defendants on plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over the pendent state law claims against the Comforts. *See* 28 U.S.C. § 1367(c)(3). Their motion for summary judgment accordingly is granted.

### III. CONCLUSION

For all of the foregoing reasons, then, it is hereby

ORDERED, that defendants' motions for summary judgment are GRANTED, and the Third Amended Complaint, it its entirety, is DISMISSED.

**IT IS SO ORDERED.**