Lucille HARLEY on Behalf of Jountae JOHNSON, Jondell Harley, and Egypt Harley, Plaintiffs,

v.

THE CITY OF NEW YORK, the New York City Department of Social Services, the New York City Child Welfare Agency, the New York City Human Resources Administration, and John Byers and Kersandra Cox in Their Individual Capacities and in Their Official Capacities as Employees of the City of New York and of the New York Human Resources Administration, Respondents.

No. 93 CV 4177.

United States District Court,
E.D. New York.

Feb. 4, 1999.

James Fogel, Bronx, NY, on behalf of the plaintiffs.

Phyllis Calistro, Assistant Corporation Counsel, New York City Law Dep't, New York, on behalf of the defendants.

### ORDER

GERSHON, District Judge.

Plaintiff Lucille Harley brings a civil rights action under 42 U.S.C. § 1983 on behalf of her three grandchildren, Jountae Johnson and Jondell and Egypt Harley. She alleges a violation of their right to due process in connection with their removal from her home in 1990 after a report of suspected child abuse was filed against her by a physician at Long Island Jewish Hospital. In particular, she alleges that they were entitled to notice and a hearing prior to the removal. Defendants move for summary judgment and argue that (1) this court should not exercise jurisdiction over plaintiffs' claim; (2) plaintiffs' due process rights were not violated because emergency circumstances existed warranting the immediate removal of the children; (3) the individual defendants were not personally responsible for the children's removal, and they are entitled to qualified immunity; and (4) plaintiffs have failed to establish municipal liability because they cannot identify a specific municipal policy that caused the alleged deprivation.

### Facts

Unless otherwise noted, the following facts are undisputed:

Jountae Johnson and Jondell and Egypt Harley are the children of Linda Harley, the daughter of plaintiff, Lucille Harley. (Plaintiff will be referred to as "Harley"). Jountae and Jondell, who were born in 1984 and 1987 respectively, lived with Harley in 1990 pursuant to a "kinship foster care" agreement that was established with the Commissioner of Social Services in 1987 after the children were adjudicated neglected and placed in the custody of the State. Egypt, who was born in 1989 with congenital respiratory problems, lived with Harley under a "restrictive place-ment" arrangement. Under both arrangements, the Commissioner retained custody of the children, but Harley agreed to provide them with food, clothing, shelter and medical care in exchange for a stipend.

On September 10, 1990, Harley brought Egypt to Long Island Jewish Hospital ("LIJ") because he was experiencing respiratory problems. Plaintiffs assert that, after waiting at the hospital for several hours, Harley was told that she was overreacting and that there was nothing wrong with the child.[1] Plaintiffs further assert that, shortly thereafter, when Harley was told that the hospital could not look after Egypt while she went to pick up Jondell, she left LIJ and took Egypt to Elmhurst Hospital where he was diagnosed with pneumonia and admitted. Defendants, in contrast, assert that Harley was told by Dr. Abraham Warshaw that Egypt had a high white blood cell count and that he needed to be admitted. An LIJ progress note dated September 10, 1990, indicates that Harley left LIJ with Egypt sometime before 6 p.m. She did not arrive at Elmhurst Hospital until 8:15 p.m.

When Warshaw discovered that Harley had left LIJ, he called the police. Warshaw asserts in an affidavit that he reported Harley because he suspected child abuse. Plaintiffs speculate that, when Warshaw discovered Egypt had pneumonia, he regretted having let Egypt go, and he called the police in an attempt to shift the blame for his mistake to Harley. Plaintiffs have not provided any evidentiary support for this claim.

In response to Warshaw's complaint, police officers went to Harley's home on the evening of September 10, 1990. Harley's daughter, Pamela, told the officers that she did not know where her mother was.

Warshaw's allegations were reported to the Office of Confidential Investigations ("OCI"), an office established by the Child Welfare Administration ("CWA"), which is a subsidiary of the Department of Social Services ("DSS"). The following morning, John

---

**1.** Harley testimony during a family court hearing on September 14, 1990, contradicts Harley's deposition testimony in this case. At the hearing, Harley testified that the doctor told her that Egypt's blood was infected but that his x-ray was negative.

Byers, a caseworker at the Queens Division for Adoption and Foster Care Services ("DAFCS"), went to Elmhurst Hospital and spoke with Harley and with Egypt's physician, Dr. Posadas. Byers' progress notes indicate that Posadas told Byers that he "seriously doubted that [Egypt's pneumonia] had anything to do with neglect on the part of the grandmother" but that he recommended that Egypt receive regular treatment from one hospital. Byers' notes further indicate that Harley said she had been told by the doctor at LIJ that Egypt's x-rays were negative but that his blood was infected and that he should stay overnight for observation. Harley told Byers that she took Egypt to Elmhurst Hospital because she wanted a second opinion. An OCI report from that day states: "During interview with foster mother OCI worker learned that she did in fact remove or prevented foster child Egypt Harley from being admitted to Long Island Jewish Hospital. Foster mother stated that the child would be in better care with her than the hospital."

The next afternoon, on September 12, 1990, Byers and Alfredo Aguilar, an OCI employee, visited Harley's home. They observed various violations of the foster-boarding regulations, including a malfunctioning smoke alarm, a rolled-up carpet blocking the front door, several bird cages with droppings and bird food at the bottom within easy reach of small children, inadequate dining and bedroom furnishings, the existence of an additional resident in the home who had not been cleared by the State, an entire bedroom filled with boxes of old clothing and toys, and piles of boxes blocking the windows. The kitchen was clean, and there was plenty of food in the house. The children's clothes were dirty, and Harley refused to allow Aguilar to interview the two older children alone. Aguilar directed Harley to bring the children for emergency medical examinations the following day and to correct some of the violations. According to Byers' notes, however, when he returned the next day, the condition of the apartment was unchanged.

Aguilar and Byers also reviewed Egypt's medical records from LIJ and spoke with several of his physicians. Egypt's records characterize Harley as "excited, confused, and defensive" on one occasion, "not alert to child's problems or needs" on another, and confused and distrustful of staff on another. Byers' progress notes indicate that Dr. Weeks, a physician at New York Hospital, stated that he did not think Harley was "fully capable of caring for such a sick child." In addition, Byers was told by staff members at New York Foundling Hospital that Harley had not brought Egypt in for follow-up care and that Harley would not consent to having Egypt treated for an ear infection.

On September 13, 1990, following three days of investigation, OCI decided to remove the children from Harley's home. Byers' supervisor, defendant Kersandra Cox, testified at a hearing that she was told of OCI's decision by her supervisor, Berry Coles. She further testified that, once OCI made a decision to remove, she had no choice but to effectuate the removal. She stated: "We had no choice. OCI was informing us that the children had to be removed. The children had to be removed."

When Byers went to Harley's home on the afternoon of September 13, 1990, Harley refused to give him the children, and, when he returned later with the police, the children were no longer there. Cox testified that she attempted to speak to Harley on the phone several times that afternoon but that Harley repeatedly hung up on her.

When Cox was unable to effectuate the removal of the children voluntarily, she went to Family Court (Robert Clark, J.) on September 14, 1990, to obtain an order directing removal. Harley appeared alone and without counsel, and the judge conducted an impromptu hearing. The Commissioner's attorney, Rhoda Rawson, requested that the children be temporarily remanded to DSS pending the filing of a petition for remand. Judge Clark remanded Egypt to the care of the Commissioner but he denied the request to modify Jountae's and Jondell's placements, stating that he was "very concerned with the aspect of summarily moving the two older children until the Court has had an actual hearing into this matter." He further stated, however, that "[i]f you act under Section 400, and you do so, I cannot properly stop

you...you take what action you think is appropriate, Miss Rawson." Judge Clark adjourned the case to September 18, 1990, to give Harley an opportunity to speak with counsel.

Immediately following the hearing, Cox and Byers removed Jountae and Jondell from the Family Court nursery without Harley's consent.[2]

## Discussion

■ Preliminarily, defendants' argument that a federal court should not entertain the claim made here is rejected. Defendants base their argument on the availability of state administrative and judicial, post-deprivation remedies to challenge removals of children from foster care. *See* N.Y. Social Services Law § 400 (allowing foster parents aggrieved by a removal determination to appeal to DSS for a full, adversary administrative hearing). Defendants rely on *Smith v. Organization of Foster Families For Equality and Reform,* 431 U.S. 816, 830, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), in which the Supreme Court upheld, against a procedural due process attack, the New York City and State statutory and regulatory procedures affording foster parents a variety of post-removal procedural safeguards followed by state judicial review. *Smith,* however, did not address the claim made here, namely, the right of foster children to a hearing prior to removal from the home of a foster parent who is a relative. In *Rivera v. Marcus,* 696 F.2d 1016, 1028–29 (1982), the Second Circuit held that a half-sister was entitled to procedural due process, including a pre-deprivation hearing, prior to termination of a foster care agreement, although it acknowledged in a footnote that this did not limit "the police power of the state to remove a child from a foster home prior to a hearing in cases of serious neglect, abuse or other emergency." 696 F.2d at 1029, n. 13. Since the claim here is that plaintiffs were entitled to a pre-deprivation hearing because there was no emergency, the post-deprivation procedures available do not preclude this court's review of the claim. The claim itself, however, does not survive defendants' motion for summary judgment.

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ A party asserting a deprivation of either substantive or procedural due process must first establish a liberty interest within the meaning of the Constitution. Children of custodial relatives like Lucille Harley possess a liberty interest in preserving the stability of their family, and, under *Rivera,* they are entitled to due process protections when the State decides to remove them from the family environment. *See Rivera,* 696 F.2d at 1024–25.

■ Once a liberty interest is established, it remains to be determined whether the procedures used by the State adequately protect the interests implicated by the plaintiffs' claim. Plaintiffs recognize that there is no right to a pre-deprivation hearing in cases where there is an emergency. They argue, however, that they have raised an issue of

2. It is undisputed that Harley eventually obtained custody of the three children but that, more recently, Jountae Johnson's natural father obtained custody over him. At oral argument, there was a dispute as to whether Jountae's father, Eric Johnson, has authorized this lawsuit. In light of my conclusion that the lawsuit is without merit, it is not necessary to await resolution of that issue.

fact as to whether there was an emergency at the time of removal in this case. Emergency circumstances have been defined to mean "circumstances in which the child is immediately threatened with harm, for example, where there exists an immediate threat to the safety of the child or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir.1991) (citations and quotation omitted). "It is not necessary, for emergency circumstances to exist, that the child be harmed in the presence of the officials or that the alleged abuser be present at the time of the taking. Rather, it is sufficient if the officials have been presented with evidence of serious or ongoing abuse and therefore have reason to fear imminent recurrence." *Robison v. Via*, 821 F.2d 913, 922 (2d Cir.1987). *See also Chayo v. Kaladjian*, 844 F.Supp. 163, 169 (S.D.N.Y.1994).

■ Defendants argue that Byers and Cox are entitled to qualified immunity based on their reasonable belief that there was an emergency. A government employee sued in her individual capacity for damages arising out of her performance of discretionary functions is entitled to qualified immunity where it was objectively reasonable for her to believe that her acts did not violate clearly established federally protected rights. *See Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996). "[T]he crucial determination to make is not the lawfulness of an official's actions, but whether it is 'objectively legally reasonable' for an official to believe he or she acted in accordance with existing law." *Scott v. County of Nassau*, 1998 WL 874840 *2 (E.D.N.Y.) (citation omitted).

The facts in dispute in this case—namely, Harley's reasons for removing Egypt from LIJ—are not material to the issue of qualified immunity and, therefore, do not preclude summary judgment. *See Washington Square Post # 1212 American Legion v. Maduro*, 907 F.2d 1288, 1292 (2d Cir.1990). The facts that are material are not in dispute. Plaintiffs accept without contesting that Cox believed she was obliged to follow OCI's order to remove the children and that Byers, in turn, followed the order given by Cox. The dispositive issue is whether it was objectively reasonable for Cox and Byers to rely on the orders given by OCI.

■ Employees are "entitled to rely on the reasonable instructions of their superior in the chain of command, particularly where those instructions were not inconsistent with their personal knowledge and experience." *Washington Square Post # 1212 American Legion*, 907 F.2d at 1293. *See also Myers v. Scott County*, 672 F.Supp. 1152 (D.Minn. 1987), *aff'd* 868 F.2d 1017 (8th Cir.1989) (dismissing a Section § 1983 action against caseworkers who participated in an investigation and were present when the children were remanded by the police on the ground that the removal was not caused by the caseworkers). Reasonable caseworkers could have concluded that OCI's instructions were reasonable. Child welfare workers are authorized to make the decision OCI made. *See Robison*, 821 F.2d at 922. And it was not unreasonable at the time for OCI to believe there was an emergency. "[T]he fear of inadequate care or supervision of the child is enough to allow removal of the child without a predeprivation hearing." *Smith v. Coughlin*, 727 F.Supp. 834, 842 (S.D.N.Y.1989). In *Smith*, the court upheld the removal of two children, even though only one of the children had made accusations of abuse and the alleged abuser was in prison, because the child's accusations of abuse provided "ample evidence" that neither child was receiving adequate care. *Id.* Here, it was objectively reasonable for Byers and Cox to believe, based on Harley's hasty removal of Egypt from LIJ and her delay in bringing him to Elmhurst Hospital, together with her responses when questioned about the removal, her apparent distrust of doctors and reluctance to cooperate with DSS, and the various code violations in her home, that OCI's removal instructions were based on a legitimate fear of grossly inadequate care of an emergency nature that was likely to continue. *See Cecere v. City of New York*, 967 F.2d 826, 829–30 (2d Cir.1992). Although the events occurring at LIJ on September 10, 1990, remain in dispute, it was not unreasonable for Cox and Byers to rely on the version presented by Dr. Warshaw. He had no prior

**142**

relationship with Harley and, thus, no apparent motive to lie. *Cf. Spencer v. Lavoie*, 986 F.Supp. at 722 (finding no requirement in the case law that a child protective worker verify the credibility or veracity of a source with the kind of scrutiny reserved for criminal cases). Therefore, even if Harley's version is true, it was not unreasonable for Cox and Byers to have relied on Dr. Warshaw, who was sufficiently concerned about child abuse that he called the police. Accordingly, their actions in removing the children were objectively reasonable, and no rational jury could find that they were not.

For the same reasons, even if plaintiffs could establish that it was actually Cox and Byers who are properly viewed as the decision-makers, they are entitled to qualified immunity because, in light of the above, reasonable child protective workers could have concluded that an emergency removal was necessary. " 'If [caseworkers] err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights.' " *Spencer v. Lavoie*, 986 F.Supp. 717, 722 (N.D.N.Y.1997) (citing *van Emrik v. Chemung County Dept. of Soc. Services*, 911 F.2d 863, 866 (2d Cir.1990)). *See also Cecere*, 967 F.2d at 830.

■ The final issue is whether plaintiffs have established municipal liability. A municipality cannot be found liable under 42 U.S.C. § 1983 simply because it employs a tortfeasor. *See Monell v. Department of Social Serv.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, the municipality itself must cause the constitutional violation. *See City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), citing *Monell*, 436 U.S. at 694–95, 98 S.Ct. 2018. In order to establish that a municipality caused a constitutional violation, a plaintiff must demonstrate a causal link between the deprivation of constitutional rights and a specific municipal policy or custom, *see Monell*, 436 U.S. at 690, 98 S.Ct. 2018, or it must demonstrate that the challenged conduct directly resulted from a decision "made by [the] government's authorized decision-makers." *Pembaur v. City of Cincinnati*, 475

U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. New York City Transit Authority*, 941 F.2d 119, 122 (2d Cir.1991).

Plaintiffs argue that the evidence establishes a policy of "deliberate indifference" to foster parents' constitutional rights. *See Gottlieb*, 84 F.3d at 518 (plaintiffs may establish the existence of a municipal policy by providing circumstantial evidence that municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction). Specifically, plaintiffs contend that "it was the official position of defendants and its employees in 1990 that the removal of children from a kinship foster care family did not require any due process rights on the part of the affected children or their families."

■ Plaintiffs have failed to provide any evidence of the existence of a municipal policy of "deliberate indifference" to foster parents' constitutional rights. Plaintiffs' assertion that defendants failed to instruct or train their employees in implementing due process protections is without evidentiary support. Plaintiffs further imply that the decision to remove the children was made by actors at the policy-making level because it was reviewed by at least three levels of supervisors within the Child Welfare agency and by counsel who appeared in Family Court. This implication is also without evidentiary support. Cox testified that the decision to remove the children was made by OCI, but plaintiffs never deposed anyone from OCI. Thus, plaintiffs have failed to offer any evidence of municipal liability, and the claims against the City must be dismissed.

## CONCLUSION

Defendants' motion for summary judgment is granted in its entirety. The Clerk of Court is directed to enter judgment for the defendants.

SO ORDERED.